[598 NYS2d 464]

VIRNA MIRAND et al., Appellants, v CITY OF NEW YORK, Defendant, and BOARD OF EDUCATION OF THE CITY OF NEW YORK, Respondent.

First Department, May 25, 1993

**APPEARANCES OF COUNSEL**

*Alexander J. Wulwick* of counsel, New York City *(Roura & Melamed,* attorneys), for appellants.

*Michael S. Adler* of counsel, New York City *(Francis F. Caputo* with him on the brief; *O. Peter Sherwood, Corporation Counsel* of New York City, attorney), for respondent.

## OPINION OF THE COURT

Sullivan, J. P.

This is an appeal from an order setting aside a verdict against the Board of Education of the City of New York in favor of plaintiffs Virna and Vivia Mirand for $50,000 and $750,000, respectively, and dismissing the complaint for failure, as a matter of law, to establish liability.

Plaintiffs are sisters and, at the time of the incident in question, were students at Harry S. Truman High School, which is part of the Northeast Bronx Educational Park, a complex near Co-op City comprised of five schools. On September 20, 1982, Virna, 17 and in her fourth year at the high school, had finished her last class, which ended at 2:00 p.m. It was her custom to wait for Vivia, a third-year student, whose last class ended at 2:40 p.m., on the main steps outside the school. As Virna descended a stairway, she inadvertently bumped shoulders with another student, later identified as Donna Webster, with whom she never had any difficulty before. Virna, whose attention had been diverted at the time of the bumping, immediately apologized. Donna, however, believing the contact to have been intentional, cursed at Virna and attempted to kick her. According to Virna, as she released Donna's leg after blocking the kick, Donna said "she was going to kill me." A bystander separated the two students.

After the encounter, Virna continued to the first floor, where she happened to meet her sister, to whom she related her experience. Vivia suggested that Virna report the matter to the security office, which was on the first floor near the front entrance to the building. Virna went to the office and knocked on the door but received no response. She testified that she then walked down the first-floor hallway and met a woman, whose name she did not know, but whom she was able to describe and knew to be an art teacher. She told the teacher about the incident, specifically that "I just had a fight on the stairwell and someone had threatened me and I went to the office and no one was there". Virna was not allowed to testify as to what the art teacher did or said in response. Virna also conceded that, when asked during an examination before trial six years earlier for an account of all her activities, she had made no mention in her response of any such report to a teacher.

After the conversation with the art teacher, Virna returned

to the security office, knocked on the door and again received no response. She then proceeded to the second floor and exited the building through the second-floor main entrance to wait for Vivia on the veranda, where school security officers and police officers were sometimes present. None, however, were present that day. After a wait of about one-half hour, Vivia arrived. The sisters, joined by other students leaving school, began to walk down one of the bilevel staircases outside the building.

As they arrived at the first landing and turned toward the second set of stairs, Virna saw Donna Webster and two male companions blocking her path. In an effort to avoid Donna, who was cursing and taunting her, Virna and her sister walked around the railing in the center of the final set of stairs and continued their descent. As Virna and her sister proceeded, Donna struck Virna with a hammer, once on the elbow and twice on the head. When Vivia tried to seize the hammer, she was struck in the back by a young girl. Then, a boy, later identified as Donna's brother, a nonstudent, who, when Vivia had just before encountered him on the stairway, had said, "[N]obody is going to jump my sister", stabbed her in the wrist with a knife. No police or school security officers were present at the time.

Virna, complaining of head and elbow pain and bleeding from the head, after being seen at the school nurse's office, was taken to Jacobi Hospital where her scalp was stitched and she was given pain medication. She returned twice to the hospital complaining of headaches and the appearance of black spots in front of her eyes. Her headaches continued "off and on" for about six months after the incident.

After having her left hand wrapped in the school nurse's office, Vivia, fearful, in pain and unable to move the fingers of the affected hand, was brought to Jacobi Hospital, where she was operated on under general anesthesia and her hand placed in a cast. She was hospitalized for seven days. After two or three months, the cast was removed and she underwent physical therapy twice weekly for about six months. Despite the therapy, the wrist was somewhat crooked, turning to the right; the pinky and ring fingers hung downward; the pinky finger lacked feeling and the ring finger was slightly numb. Vivia returned to the hospital, which referred her to a plastic surgeon, who performed a second surgical procedure, requiring further hospitalization for six days. The operation straightened her fingers somewhat but the pinky remains

misaligned. Vivia underwent three further minor surgical procedures in the plastic surgeon's office.

Despite these procedures, Vivia's left hand has not returned to normal. Her ability to bend the hand is limited as is the movement of the fingers, as a result of which she cannot grasp properly. She experiences pain when the hand is bumped, sharp pain extending to her shoulder in cold weather and numbness. She had to discontinue a computer skills course because the problems with her hand interfered with her typing. She also has some scarring from the incisions; they are described as unsightly and are a source of embarrassment to her.

In the fall of 1982, there were 13 school safety officers, trained in security operations, who wore uniforms and carried radios but no guns, assigned to the high school. They operated out of a first-floor security office, which served the entire Northeast Bronx Educational Park. Inside the first-floor main entrance, there was also a security desk, to which a security officer was assigned at all times for the purpose of screening visitors. Since most students left the building at 2:40 P.M., after the eighth period, they were encouraged, so as to promote security, to leave through a few preferred exits, the two first-floor exits leading to the sidewalk, the two rear exits on either side of the field house and the second-floor main entrance. School safety officers stationed throughout the building were expected to cover the exits at dismissal time; ideally, the security desk on the first floor would be manned by three officers; similarly, two to five school safety officers would be assigned to the second-floor main entrance. The security plan for the school did not require that any of those officers be stationed outside the building on the second-floor veranda, which extended all the way around the building. Nor were there any rules or regulations of the Board of Education requiring the posting of security officers on the veranda at dismissal time.

The teachers and paraprofessionals were also expected to assist in providing security. A teacher to whom a school incident was reported was to exercise independent judgment as to how to proceed, handling the matter alone if, in the teacher's judgment, the incident was a minor one, or seeking the assistance of another, a dean or administrator, for instance, if the incident was more serious. The security coordinator for the Northeast Bronx Educational Park complex had no recollection as to how many fights had occurred at the

school between the fall of 1981 and the summer of 1982; nor did he have any recollection as to whether the school safety officers assigned to the first and second floors at dismissal time were at their posts at the time of this incident or were attending to matters elsewhere.

The only theory submitted to the jury was negligent supervision. The jury was asked to determine whether the Board had actual or constructive notice of danger to the sisters. Only if it determined that such notice was present was the jury to consider whether the Board failed to provide adequate supervision. In that regard, the jury was asked to consider whether the school failed to carry out its own safety guidelines. The jury returned a verdict as indicated.

Without specifically addressing any other aspect of the Board's posttrial motion, the IAS Court, "with great reluctance", granted the motion to the extent of finding that plaintiffs' evidence was insufficient as a matter of law to establish liability for negligent supervision. It based its determination on three specific findings: lack of notice of a specific danger, lack of proof as to any inadequacy in supervision and lack of proof of proximate cause since plaintiffs adduced no evidence that conformity to reasonable standards would have prevented the incident. We reverse and reinstate the verdict.

On a challenge to the sufficiency of a verdict in favor of a plaintiff, the evidence in support thereof must be accepted as true and viewed in the light most favorable to the plaintiff. *(Alexander v Eldred,* 63 NY2d 460, 464.) "For a court to conclude as a matter of law that a jury verdict is not supported by sufficient evidence * * * [i]t is necessary to first conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial." *(Cohen v Hallmark Cards,* 45 NY2d 493, 499.) Only if the evidence is such that it would be "utterly irrational for a jury to reach the verdict it has determined upon" may a court conclude "that the verdict is as a matter of law not supported by the evidence." *(Supra,* at 499.)

In *Logan v City of New York* (148 AD2d 167, 171), this Court, quoting PJI 2:227, articulated the rule applicable to the duty of a Board of Education to supervise its pupils as being " 'the same degree of care and supervision over the pupils under its control as a reasonably prudent parent would exer-

cise under the same circumstances.' " The Court of Appeals has likened the "special relationship," as that term is used in a negligence context, between a school and its students to the relationship "between carriers and their passengers or innkeepers and their guests." *(Pratt v Robinson,* 39 NY2d 554, 560.) The special duty owed by a school to its students "stems from the fact of its physical custody over them" *(supra,* at 560); by taking the student into its charge, "the school has 'deprived [the child] of the protection of his parents or guardian' " *(supra,* at 560, quoting from Restatement [Second] of Torts § 320, comment *b* [matter in brackets in original]). The school's duty is "coextensive with and concomitant to its physical custody of and control over the child." *(Pratt v Robinson, supra,* at 560.) While not an insurer of its students' safety, a school "will be held liable for a foreseeable injury proximately related to the absence of supervision." *(Hanley v Hornbeck,* 127 AD2d 905, 906.) The standard for determining whether a school was negligent in executing its supervisory responsibility is whether a parent of ordinary prudence, placed in the identical situation and armed with the same information, would invariably have provided greater supervision. *(Lawes v Board of Educ.,* 16 NY2d 302, 305.)

At trial, plaintiffs advanced three theories in support of their claim of breach of duty: that the teacher to whom Virna reported the initial encounter was remiss in failing to take appropriate action; that the school negligently failed to follow its own security plan that school safety officers be stationed outside the building on the first and second floors at dismissal time and that, without regard to the requirements of its security plan, the circumstances presented, including Virna's conversation with the teacher, were such as to require that school safety officers be so stationed.

According to the evidence, the security plan in effect at the Harry S. Truman High School was designed to afford maximum efficiency at certain times, such as dismissal, when large numbers of students congregated and fights among them were more likely to erupt. The plan called for the limiting of egress from the building to those exits where, as the security coordinator testified, "we felt we had good vision and good security" and the posting of uniformed school safety officers at these "key areas", including the second-floor main entrance and the two first-floor exits. The second-floor veranda was a priority area since someone stationed there "with a radio had good visibility down at these dismissal exits and could have actu-

ally looked down and see, you could see what a couple of hundred students are doing as they leave the building." The plan called for three officers to be assigned to the first-floor main entrance and two to five to the second-floor main entrance at dismissal time, one of whom, presumably, would be deployed to the second-floor veranda observation post.

While, no doubt, these assignments were aspirational and, given the situation on any particular day, not always realizable, at the time of the incident complained of, the two most crucial posts went unmanned. There were, according to the testimony, no security officers on the veranda and none outside the first-floor main entrance. The Board offered no explanation as to why no officers were present. Yet, according to Vivia, when she ran into the building to the security office for assistance after the incident she found four or five security officers present.

In light of such a record, a jury could find that the Board, having recognized the need for and put into effect a security plan, breached its duty to provide plaintiffs with adequate supervision at a time when such supervision was most critical. *(See, e.g., Lopez v City of New York,* 4 AD2d 48, *affd* 4 NY2d 738.)* Moreover, the school, through one of its teachers, was made aware of a specific threat against Virna by a known identifiable student and did nothing about it other than to send her back to the security office,* which, at the time, was still closed. According to the security coordinator, in such circumstances the teacher should act as a security officer and take a student in Virna's predicament to a dean or administrator. The teacher could have remained with Virna until her sister arrived and escorted them to their bus, notified the police or called their parents to pick them up.

While the general duty of a school to supervise is unqualified and mandatory and not dependent on notice *(see, Coon v Board of Educ.,* 160 AD2d 403; *Decker v Dundee Cent. School Dist.,* 4 NY2d 462, 464), notice is necessary in this case with respect to the special danger of violence posed by Ms. Webster. *(See, e.g., James v Gloversville Enlarged School Dist.,* 155 AD2d 811, 812-813; *Gattyan v Scarsdale Union Free School Dist. No. 1,* 152 AD2d 650, 652.) Viewing the evidence in a light most favorable to plaintiffs, the jury was justified in concluding that a report of the earlier incident had been made

---

* Although Virna was not permitted to testify as to what the teacher told her, this is a fair interpretation of the evidence.

to the art teacher. The inability to bring the matter to the attention of security personnel because the office was closed, at a time of day when some, but not most, of the students were being dismissed, cannot inure to the benefit of the Board. It was for the jury to decide whether sufficient time existed between the report to the art teacher and the subsequent assault to enable the school to take appropriate action. In such circumstances, it was not unforeseeable that an altercation might arise. Nor was it necessary that plaintiffs demonstrate that the precise manner in which they were injured or the extent of their injuries was foreseeable. *(See, Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315.)* In that regard, we reject the Board's argument that the notice to the art teacher was woefully deficient because it lacked specifics. Virna's communication of the threat made to her one-half hour earlier and her obvious concern as evidenced by her attempts to report it to the security office constituted sufficient "notice of a particular danger at a particular time" *(Lawes v Board of Educ.,* 16 NY2d, *supra,* at 306). The point is that the teacher did nothing.

Since the school was chargeable with notice, cases such as *Brown v City of New York* (130 AD2d 701), cited by the Board, are inapplicable. In *Brown,* where it was alleged that the defendant Board of Education had actual notice of the vicious propensities of the student who stabbed the plaintiff, the Second Department held that there had been no notice of the need for supervision at the time of the stabbing. Similarly, since the school had sufficient notice, those cases in which it has been held that the plaintiff's injuries were caused by a sudden precipitous act which could not realistically have been anticipated or prevented are not applicable here. *(See, e.g., Ohman v Board of Educ.,* 300 NY 306 [plaintiff injured when struck in the eye by pencil thrown by another student during teacher's absence]; *Tomlinson v Board of Educ.,* 183 AD2d 1023, 1024 [plaintiff injured when another student pulled chair out from under him as he attempted to sit down; teacher on lunch break and no classroom aide present at the time]; *Hauser v North Rockland Cent. School Dist. No. 1,* 166 AD2d 553 [plaintiff injured when struck by rock thrown by fellow student in schoolyard during lunch recess; at least one and possibly two teachers and/or monitors present at the time]; *Hanley v Hornbeck, supra,* 127 AD2d 905 [plaintiff injured in a fight with another student during gym class; teacher present]; *Bertola v Board of Educ.,* 1 AD2d 973 [plaintiff assaulted by

another student in classroom; teacher just outside the door guiding other students into the classroom].)

Given a record which shows that at the time of the assault there were no safety officers on the veranda or outside the first-floor main entrance, the jury could consider, on the issue of proximate cause, the deterrent effect of the presence of uniformed guards in a school whose officials were well aware of its security needs. In basing its determination to dismiss, in part, on the absence of proof that the presence of the safety officers at their posts "would have deterred the third-party from attacking the plaintiffs", the IAS Court usurped the jury's function. The trier of the facts could find that the sight of uniformed security guards with radios and badges would have had a deterring effect. *(See, Ferrill v Board of Educ.,* 6 AD2d 690.)* Moreover, it is not at all clear that the presence of at least one safety officer could not have prevented the incident, which did not occur without any forewarning. As the evidence shows, neither Ms. Webster nor her brother appeared out of nowhere. Rather, as Virna testified, plaintiffs were walking down the upper flight of steps from the veranda when Donna, cursing and shouting from the first-floor landing, blocked her path. Virna testified that she went out of her way to avoid her but that Donna continued to block their path. Donna, still "shouting and cursing", then took out a hammer and started "swinging it at" Virna. Had security officers been present, they might have been able to take some action to prevent the assault, even assuming, arguendo, that their mere presence would not have served as a deterrent to the assault.

■ The damages awarded to Vivia were not, as argued, excessive. While the injury was to her nondominant hand and her pain is not constant, it is, nonetheless, substantial. She has undergone several operations, has functional problems and the prognosis is not favorable. There are also serious cosmetic concerns. In such circumstances, the $750,000 award for pain and suffering should not be reduced. *(See, e.g., Morales v Jolee Consolidators,* 173 AD2d 315.)*

■ Nor, do we find the verdict to be against the weight of the evidence. Finally, the summation by plaintiffs' counsel, while hardly a model of fidelity to the record, did not subvert the truth-finding process or, in our view, prejudicially affect the verdict, certainly not to the extent of requiring a new trial.

Accordingly, the judgment of the Supreme Court, Bronx

County (Howard R. Silver, J.), entered March 25, 1992, granting defendant Board of Education's motion to set aside the verdict and dismissing the complaint, should be reversed, on the law, without costs or disbursements, the motion denied and the verdict reinstated.

MILONAS, ROSS, KASSAL and RUBIN, JJ., concur.

Judgment, Supreme Court, Bronx County, entered March 25, 1992, which granted defendant-respondent's motion to set aside the verdict and dismiss the complaint, reversed, on the law, without costs or disbursements, the motion denied and the verdict reinstated.