[630 NYS2d 996]

SALVATORE CURIALE, Superintendent of Insurance of the State of New York, as Liquidator of AMERICAN FIDELITY FIRE INSURANCE COMPANY and Another, Appellant, v PEAT, MARWICK, MITCHELL & Co., Respondent and Third-Party Plaintiff, et al., Third-Party Defendants.

First Department, August 24, 1995

## APPEARANCES OF COUNSEL

*John M. Nonna* of counsel *(Michael A. Knoerzer* and *Tracy A. Stein* on the brief; *Werner & Kennedy,* attorneys), for appellant.

*Sidney Davis* of counsel *(Dennis H. Tracey, III, Mark J. Schirmer* and *Edwin D. Scott* on the brief; *Davis, Scott, Weber & Edwards, P. C.),* for respondent.

## OPINION OF THE COURT

NARDELLI, J.

As stated by the Trial Judge, the claim here is that as the result of accounting malpractice the Insurance Department was induced to enter into a settlement of a rehabilitation

proceeding in August of 1984, which settlement delayed the rehabilitation of the insurance company sought to be rehabilitated for a period of approximately 13 months.

■ ■ The trial court found that, although there was "enough evidence in the record for the jury to conclude that some delay perhaps was occasioned as a result of the defendant's malpractice," the length of the delay caused by the tortious conduct was not shown with sufficient precision. It therefore set aside the jury's verdict. The evidence before the jury, however, amply supported its verdict, and Trial Term was in error when it granted judgment to defendant notwithstanding the jury verdict for plaintiff. Further, the IAS Court directed a verdict against the plaintiff Superintendent on the fraud claim against defendant and the claim that it aided and abetted American Plan Corporation (American Plan) in committing a fraud. This was erroneous, since factual issues existed which should have been submitted to the jury on these causes of action.

"On a challenge to the sufficiency of a verdict in favor of a plaintiff, the evidence in support thereof must be accepted as true and viewed in the light most favorable to the plaintiff. (*Alexander v Eldred,* 62 NY2d 460, 464.)" (*Mirand v City of New York,* 190 AD2d 282, 287, *affd* 84 NY2d 44.) Accordingly, the following factual presentation resolves, as the jury found, all issues in favor of the ultimate verdict for plaintiff.

American Fidelity Fire Insurance Company (American Fidelity) and American Consumer Insurance Company (American Consumer) became insolvent and were placed in liquidation with the plaintiff, Superintendent of Insurance, as the Liquidator. Both American Fidelity and American Consumer were owned by American Plan, which itself was owned and controlled by Abe Lieber. American Plan caused the two corporations to pay illegal fees for management services. These fees were the major source of income for American Plan and were supposed to be equal to "actual" operating costs of American Plan. However, Murray Lemonik, the former president of all three corporations, testified that after Lieber gained control of American Plan, the management fees were doubled even though American Fidelity and American Consumer received no significant benefits from the increase. Furthermore, Richard Pluschau, a former member of the board of directors and senior vice-president of American Plan, questioned Lieber's acquisition of an insurer, Life of Montana (LOM) by the two insurers since they did not have "adequate

surplus" to finance the LOM acquisition. He also questioned the fact that American Plan sought to acquire properties owned by Lieber, acquisition of which would relieve Lieber of personal obligations. Pluschau also discovered improprieties in American Plan's 1983 financial statements, which, as chief financial officer, he refused to permit to be filed. These and other officers of American Plan, American Fidelity and American Consumer who complained about the illegal and improper activities were either fired by Lieber or forced to resign. Alexander Grant & Company (Grant), the auditors for American Plan, initially retained to audit the 1983 consolidated financial statements, questioned the legality of American Plan's activities and acquisitions including LOM by American Fidelity, the excessive charges for management fees, the loans taken by American Plan for management fees to be earned in the future (advance management fees), and American Plan's financial viability. American Plan, i.e., Lieber, subsequently terminated Grant, after Grant proposed significant adjustments to the financial statements and said that, without such adjustments, it would render an adverse opinion. Despite this, American Plan filed an "8-K" letter with the Securities and Exchange Commission, dated April 9, 1984 asserting that Grant had *not* proposed any audit adjustments to the financial statements and issued a false press release that Grant had not proposed any audit adjustments at the time of its termination. Grant promptly filed a letter with the SEC setting forth the true facts.

On April 9, 1984, American Plan hired defendant Peat, Marwick, Mitchell & Co. (Peat Marwick) to perform an audit of American Plan's consolidated financial statements as of and for the year ended December 31, 1983, i.e., to prepare and certify the accuracy and fairness of American Plan's, American Fidelity's and American Consumer's financial statements. American Plan's management met with Peat Marwick's audit partners and provided them with the "complete picture" of the financial state of the corporation. Peat Marwick was informed of the warnings of Pluschau and another officer, Rowan, concerning the legality of the acquisitions and the activities and financial viability of American Fidelity and American Consumer. While American Plan told Peat Marwick that there were no problems with Grant and that Grant had not proposed any adjustments to the financial statements, Peat Marwick, pursuant to the Generally Accepted Accounting Standards, asked Grant about its termination and was

informed by Grant that it *had* proposed substantial adjustments to the financial statements. Significantly, Peat Marwick conceded knowledge of American Plan's misrepresentations by the receipt of such information from Grant and by the receipt and review of Grant's response to American Plan's 8-K letter, which specifically stated that Grant had proposed "significant" adjustments. Moreover, Peat Marwick learned that the FBI and various news media had implicated American Plan in questionable business practices and that Lieber was a defendant in a lawsuit alleging that as a member of the board of directors of another insurance company he had participated in "upstreaming" money from its subsidiary insurance companies, allegations very similar to some of the charges herein, of which Peat Marwick was aware. There was no investigation by Peat Marwick of these allegations, nor did they raise a "red flag" concerning the allegations with respect to American Plan.

Accepting the assignment to perform the 1983 audit, Peat Marwick had to assess the financial viability of American Fidelity and American Consumer to be able to arrive at the true financial picture of American Plan. The evidence at trial established, however, that Peat Marwick had departed from Generally Accepted Accounting Standards in its treatment of American Plan's valuation of American Consumer's LOM stock at $1.6 million, American Plan's excessive management charges to American Fidelity and American Consumer, and the ability of American Fidelity and American Consumer to recover these management fees. There was evidence that Peat Marwick knew that LOM had received an audit report stating that it was in danger of going out of business and that its stock was almost worthless. Even discounting this audit report, Insurance Law § 91 mandates valuation of the stock at its book value, not its market value. The book value of the stock at the time was about half of the $1.6 million valuation of the stock. According to plaintiff's expert at trial, had Peat Marwick properly valued LOM, it would have known of American Consumer's insolvency. Vincent Laurenzano, Chief Examiner of the Insurance Department, expressed the concern of that Department over the financial viability of LOM at a meeting with Paul Zucconi, audit partner of Peat Marwick. Zucconi admitted in testimony that his firm knew at that time that the auditors of Life of Montana believed that LOM was in danger of going out of business but that he did not inform Laurenzano of this concern.

Peat Marwick was aware of the provisions of sections 86 and 91 of the New York Insurance Law which govern the valuation of the LOM stock, i.e., that section 86 provides that an insurer may not acquire an interest in another insurer which exceeds 50% of its surplus, and section 91, in pertinent part, that the stock of an insurance company acquired by another insurer must be valued at the *lesser* of its market value or its book value. It did not perform audit tests to determine compliance on the part of American Plan with the statutes. There was expert testimony that this also constituted a departure from the Generally Accepted Accounting Standards.

Insurance examiner Donald Reichenbach testified that he informed Bruce Milligan, another Peat Marwick audit partner on the American Plan account, that pursuant to section 91, American Consumer could carry only the lesser of the book value or the market value of LOM on its books. At the trial, Milligan admitted that even though Peat Marwick should have valued the stock at book value, the work papers were *not* corrected to include this legal, lower value. Reichenbach also informed Milligan of the relevancy of section 86 but Milligan admitted that Peat Marwick did not perform any audit work to determine if the acquisition of Life of Montana met the "less than 50% of surplus" test set forth in that section as a prerequisite for acquisition of another insurer. Zucconi told Laurenzano that Peat Marwick relied on a legal representation of counsel for American Plan that the value of the stock was satisfactory under section 86, but this was never produced at trial, nor did it appear in Peat Marwick's work papers. Plaintiff contended that since American Plan had already made false representations to Peat Marwick, the falsity of which Peat Marwick was aware, Generally Accepted Accounting Standards precluded any reliance by Peat Marwick on such an opinion from American Plan, even assuming one existed.

As to the exorbitant management fees charged to American Fidelity and American Consumer by American Plan, Peat Marwick failed to conduct any audit tests to explain the unexplained doubling of management fees which occurred from 1982 to 1983. In addition, while Peat Marwick knew that the ability of American Fidelity and American Consumer to recover "advance" management fees paid to American Plan directly impacted upon their financial viability and solvency,

and despite guidance from the Insurance Department, Peat Marwick did not perform any independent audit in determining that American Plan could list these fees as admissible. Peat Marwick, instead, simply relied once again upon representations from in-house counsel to American Plan, without testing or checking the accuracy of such representations.

When the Insurance Department conducted its investigation of these insurers, reports from Donald Reichenbach to the Superintendent of Insurance, dated June 4, 1984, detailed that American Fidelity was impaired and that American Consumer was insolvent. Thus, the Superintendent commenced a proceeding to place both into rehabilitation. There was evidence at trial, however, demonstrating that once again Peat Marwick did all it could to thwart this attempt at minimizing losses.

On June 11, 1984, American Plan issued a press release which reported positive results for 1983 and claimed such results had been audited by Peat Marwick. Although Peat Marwick *knew* this representation was false, and that it had *not* completed its audit and could not certify the earnings as announced in the press release, Peat Marwick, unlike Grant, not only took no steps to correct the misrepresentations, it actually took an active role in disseminating them. Thus, Zucconi testified he attended a meeting of the board of directors of American Plan before the issuance of the press release and *authorized* its issuance. Further, a second false press release was issued on June 29, 1984, which reiterated positive earnings for 1983 "which have been audited by Peat Marwick", and Peat Marwick did nothing to correct this misrepresentation.

In opposition to the rehabilitation proceeding, Ivan Kline, an attorney on behalf of American Plan, submitted an affirmation giving a summary of testimony that Paul Zucconi, identified in that affirmation as the Peat Marwick partner in charge of the audit, and Bruce Milligan, as audit manager, would give. Both of these Peat Marwick agents testified they read the affirmation and knew it would be filed in the rehabilitation proceeding. The affirmation asserted that Zucconi and Milligan would testify that American Plan was cooperative and willing to furnish all documents. Yet the work papers, signed by Zucconi and Milligan, noted that American Plan was *not* cooperative and that the auditors had difficulty obtaining documents and verification. Further, the affirmation stated that Peat Marwick was not aware of any false misrep-

resentations made by American Plan, etc., yet at that time, Peat Marwick knew it had issued two false press releases *(see, supra).*

Also submitted to the rehabilitation court were affidavits from Harold Fisher, Esq. and Elmo Zumwalt, directors of American Plan, which noted that Peat Marwick had reviewed and authorized the June 11, 1984 press release, and that based on its representations they believed Peat Marwick would issue an unqualified opinion.

On July 10, 1984, in a meeting with Laurenzano, Zucconi stated that Peat Marwick considered both the advance management fees and the value of LOM to be admissible assets, although at the time Peat Marwick had not done sufficient audit work to determine whether those assets were indeed admissible. Zucconi admitted he did not inform Laurenzano that the auditors of LOM had informed him of the corporation's problems and financial difficulties. Further, at a deposition of Zucconi on July 13, 1984, he testified that American Fidelity and American Consumer had sufficient statutory surplus to satisfy the solvency requirements of the Insurance Law. However, at the trial, Zucconi conceded that, at the time of the rehabilitation deposition, Peat Marwick had not conducted sufficient audit tests to determine whether these corporations had adequate statutory surplus. Zucconi testified at the deposition that American Plan could repay the advance management fees and that the value of LOM was about $1.5 million. He further testified that but for the rehabilitation proceeding the audit would essentially be complete.

There was testimony by Insurance Department employees that Peat Marwick's statements and positions were substantial factors that influenced them into entering a settlement agreement. They recognized that Peat Marwick had an international reputation and that, therefore, any rehabilitation proceeding would not only be long and costly, but the Department would have a large burden in obtaining relief. Consequently, a settlement agreement was entered into on August 2, 1984, requiring American Plan, *inter alia,* to repay $6.8 million in loans (the advance management fees) by February 1985. While American Plan was to pay this amount from real estate equities, Peat Marwick knew at the time that there was not sufficient equity in the properties to satisfy the obligation.

Less than a month after execution of the agreement, the companies violated the agreement by failing to transfer $2

million of net equity in real estate assets as required. On September 28, 1984, defendant issued a qualified opinion on the consolidated financial statement of American Plan and its subsidiaries. The statement falsely stated that American Fidelity and American Consumer had a statutory surplus of $6.8 million. Although the plaintiff asked for an immediate order of rehabilitation on at least three occasions from September to February 1985, the court did not put the companies into rehabilitation. On February 2, 1985, the deadline for repaying the $6.8 million advance, the court held a hearing at which American Plan admitted it had not repaid the money, but the court denied plaintiff's request for an order of rehabilitation and adjourned the matter numerous times thereafter, holding conference calls and hearings. However, the court did not issue the order of rehabilitation until September 6, 1985.

The law governing the standards for setting aside a jury verdict has been succinctly stated by the Court of Appeals: "For a court to conclude as a matter of law that a jury verdict is not supported by sufficient evidence, however, requires a harsher and more basic assessment of the jury verdict. It is necessary to first conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial. The criteria to be applied in making this assessment are essentially those required of a Trial Judge asked to direct a verdict. It is a basic principle of our law that 'it cannot be correctly said in any case where the right of trial by jury exists and the evidence presents an actual issue of fact, that the court may properly direct a verdict' *(McDonald v Metropolitan St. Ry.,* 167 NY 66, 69-70; accord *Loewinthan v Le Vine,* 299 NY 372; *Wessel v Krop,* 30 AD2d 764). Similarly, in any case in which it can be said that the evidence is such that it would not be utterly irrational for a jury to reach the result it has determined upon, and thus a valid question of fact does exist, the court may not conclude that the verdict is as a matter of law not supported by the evidence [citation omitted]." *(Cohen v Hallmark Cards,* 45 NY2d 493, 499.)

As noted, *supra,* the trial court conceded that there was enough evidence in the record for the jury to conclude that some delay in the rehabilitation proceeding was caused by the defendant's malpractice. However, the court found that there was no way for the jury to determine the precise *extent* of the delay caused by such malpractice. In a matter where it was

impossible to determine the value of works of art with "an absolute certainty", the Court of Appeals held: "so long as the figure arrived at had a reasonable basis of computation and was not merely speculative, possible or imaginary, the Surrogate had the right to resort to reasonable conjectures and probable estimates and to make the best approximation possible through the exercise of good judgment and common sense in arriving at that amount [citations omitted]. This is particularly so where the conduct of wrongdoers has rendered it difficult to ascertain the damages suffered with the precision otherwise possible" *(Matter of Rothko,* 43 NY2d 305, 323).

The defendant contends that there is no evidence as to how quickly the rehabilitation proceeding could have gone to trial or what the Justice presiding in that proceeding would have done if the case had gone to trial, or how quickly the Justice would have acted. Indeed, the defendant notes that when the Insurance Department urged the court to take immediate action to enter an order of rehabilitation, the Judge continued to put off hearing dates and substitute conference calls in the hope that the parent or subsidiaries would do better, and that he was reluctant "to take the companies under and, frankly, the fine job that the lawyers did for the companies in keeping them afloat when they had no right to be afloat".

The exhaustive factual presentation above shows that there was more than enough evidence before the jury for it to determine the delay caused by the malpractice of Peat Marwick. There is no need for a repetition of that evidence. However, the result of the jury's interpretation of that evidence was that it awarded $1,816,000 as damages. This corresponds to the *actual* excess management fees taken from American Fidelity and American Consumer during the period following the August 1984 settlement with the Insurance Department based upon the false information received from American Plan with the assistance and approbation of defendant, through November 1984. This settlement agreement gave American Plan a six-month period from August 2, 1984 to February 2, 1985, to repay the advance management fees paid by the subsidiaries. Thus, while the Insurance Department sought relief from the rehabilitation court earlier, this agreement tied its hands essentially for this six-month period. The jury concluded that this six-month delay was occasioned by the malpractice of defendant since the defendant's conduct induced the plaintiff to enter into the agreement. Thus, the jury excluded damages from February 2, 1985 to the date of

rehabilitation, September 6, 1985. Further, most likely because of the judicial delays, the jury further discounted the period of delay by excluding the period from December 1984 to January 1985 from its computation of damages. This is a valid and logical line of reasoning which would support the jury's verdict. Another rational interpretation of the above evidence could have supported an award based upon a period commencing in July 1984, when Peat Marwick allowed its name to be used and made misrepresentations to the Insurance Department on behalf of American Plan and the rehabilitation court. This period extends to November 1, 1984, when hearings were held in the rehabilitation court at the request of the plaintiff. Using the defendant's summation to the jury as a guide, the damages as presented were certainly ascertainable as to this period. Defendant's counsel told the jury in summation: "I think there are only two realistic times to apply if you find that my client is liable. And that is to, from the time of Zucconi's testimony to the middle of August, when the first violation occurs. And Mr. Wenick goes screaming to Court. That's a one-month period which, using Mr. Larsen's methods, adds up to $774,000. The only other period, if you can really associate these excess management fees that Larsen has calculated, would be to take a period from July when Zucconi testified to September in 1984, two month period, when in fact they had the first Court hearing in front of Justice Malloy, and Justice Malloy heard of the violations. Certainly by that time, there was nothing that Peat Marwick was doing that would be continuing to cause harm. Justice Malloy was then aware of violations of the settlement agreement and in a position to do something. *And the damages, if you use his, Mr. Larsen's method for that period would be 1.9 million dollars.*" (Emphasis added.)

Contrary to the trial court's conclusions, the jury did consider the "imponderables" in coming to its verdict. Apparently, the jury *excluded* the period *prior* to rehabilitation attributable to the delays occasioned by the rehabilitation court. Further, contrary to the trial court's assertion, the evidence demonstrates that there is no doubt that American Fidelity and American Consumer could not have successfully opposed rehabilitation without the assistance of defendant. Simply put, a jury could reasonably have found on the evidence presented that without the active, aggressive and misleading help of Peat Marwick, there would have been no hesitation on the part of the rehabilitation court in finding

these companies insolvent. In any event, the jury took the rehabilitation court's hesitancy to act into account and apparently excluded periods attributable to judicial delay from the damages it awarded plaintiff.

█ On a prior appeal we affirmed the denial of summary judgment to defendant, not only as to the first cause of action for the negligence of Peat Marwick, but also as to the second and third causes of action which allege, respectively, fraud and aiding and abetting the perpetration of fraud *(Curiale v Peat, Marwick, Mitchell & Co.,* 188 AD2d 388). However, after the plaintiff presented its case at trial, the court directed a verdict against plaintiff on these latter two causes of action concluding that the proof did not support submitting the case to the jury on either of those causes. This was erroneous in view of the evidence which had been submitted before the jury.

The same standards that prevailed upon the trial court's dismissal of the action notwithstanding the jury's verdict are applicable to its dismissal of these two causes of action before submission to the jury. Where the right to a trial by jury exists and the evidence presents actual issues of fact, it is improper for the court to direct a verdict *(McDonald v Metropolitan St. Ry. Co.,* 167 NY, *supra,* at 69-70). Again, before a decision is made that plaintiff failed to make out a prima facie case, the plaintiff's evidence *must* be accepted as true and plaintiff must be given the benefit of every favorable inference which can reasonably be drawn from that evidence *(see, Harding v Noble Taxi Corp.,* 182 AD2d 365, 369).

Applying these principles, it is clear that plaintiff made out a prima facie case on both these latter causes of action involving fraud on the part of defendant. While defendant asserts there was no reliance on the part of the Insurance Department on any misrepresentation by Peat Marwick, the bald fact that the plaintiff entered into the settlement agreement with American Plan showed its reliance on the statements of defendant. The evidence is clear that except for these misrepresentations as to the solvency of the subject corporations the Insurance Department would not have entered into the agreement. The representations need not have been the *exclusive* cause of plaintiff's action in entering the agreement; it is sufficient that they were a substantial factor in inducing the plaintiff to act the way it did *(State St. Trust Co. v Ernst,* 278 NY 104, 122).

Further, defendant asserts that the record contains no evidence of either deception or intent to defraud. However, accepting the plaintiff's evidence as true, it was sufficiently demonstrated that Peat Marwick knowingly or recklessly made material misrepresentations constituting fraud and aided and abetted fraud by providing services that helped in the commission of the fraud. "Accountants, however, may be liable to third parties, even where there is lacking deliberate or active fraud. A representation certified as true to the knowledge of the accountants when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability. A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet. In other words, heedlessness and reckless disregard of consequence may take the place of deliberate intention." *(State St. Trust Co. v Ernst, supra,* at 112.)

Finally, the evidence set forth in detail above also supports a prima facie case for punitive damages for defendant's fraudulent conduct. Thus, again accepting plaintiff's evidence as true, the defendant acted in utter disregard of the public interest in defrauding a public agency and in aiding and abetting the misrepresentations made to such agency. Accordingly, this claim should also have been submitted to the jury. "Whether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of the original trier of the facts" *(Nardelli v Stamberg,* 44 NY2d 500, 503).

Accordingly, the judgment of the Supreme Court, New York County (Ira Gammerman, J.), entered June 7, 1993, dismissing the action, should be reversed, on the law, the verdict of the jury in favor of plaintiff on the first cause of action reinstated, and judgment for plaintiff entered thereon, and the remaining causes of action reinstated and remanded for trial, with costs and disbursements payable to plaintiff.

SULLIVAN, J. P., KUPFERMAN and TOM, JJ., concur.

Judgment, Supreme Court, New York County, entered June 7, 1993, reversed, on the law, the verdict of the jury in favor

of plaintiff on the first cause of action reinstated, and judgment for plaintiff entered thereon, and the remaining causes of action reinstated and remanded for trial, with costs and disbursements payable to plaintiff.