**THE HIGH VIEW FUND, L.P. and the High View Fund, Plaintiffs,**

**v.**

**E. William HALL and Karen W. Hall, Defendants.**

**Nos. 98 Civ. 1390(SAS), 98 Civ. 2277(SAS).**

United States District Court, S.D. New York.

Sept. 16, 1998.

---

**422**

Daniel Robbins, Brock Silverstein McAuliffe, LLC, New York City, for Plaintiffs.

Curt D. Marshall, Beatie and Osborn, New York City, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

On May 29, 1998, plaintiffs The High View Fund, L.P. and The High View Fund (collectively, "High View") filed an Amended Complaint in this consolidated action, asserting claims for (1) violations of the Federal securities laws, (2) fraudulent inducement, (3) violations of the Delaware Blue Sky laws, (4) breach of fiduciary duty, (5) unjust enrichment, (6) conversion, and (7) breach of contract. This Court has subject matter jurisdiction over the Federal securities law claims pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. Jurisdiction over the state law claims is premised on the Court's supplemental jurisdiction, 28 U.S.C. § 1367(a), and diversity jurisdiction, 28 U.S.C. § 1332(a). Defendants E. William Hall and Karen W. Hall now move to dismiss the Amended Complaint pursuant to Fed. R.Civ.P. 8(a), 9(b), and 12(b)(6).

## I.  Factual Background

This action arises out of plaintiffs' $1 million investment in United Golf Properties, Inc. ("United Golf") and defendants' alleged misuse of United Golf's assets. For purposes of this Opinion, the following facts, drawn from the Amended Complaint, are assumed to be true.

Plaintiff The High View Fund, L.P. is a limited partnership formed under the laws of Delaware, with its principal place of business in New York, New York. Amended Complaint at ¶ 9. Plaintiff The High View Fund is a limited liability company, organized under the laws of the Bahamas, with is principal place of business in the Bahamas. *Id.* Both The High View Fund, L.P. and The High View Fund are investment partnerships. *Id.* United Golf is a corporation organized under the laws of Delaware, with its principal place of business in Timonium, Maryland. *Id.* at ¶ 12. United Golf was purportedly in the

business of seeking out and acquiring golf properties. *Id.* William Hall was the President of United Golf and the Chairman of its Board of Directors until March 2, 1998, and Karen Hall was a director of United Golf until February 20, 1998. *Id.* at ¶¶ 10–11, 33, 37. The Halls are both citizens of Maryland. *Id.* at ¶¶ 10–11.

### A. The Offering Memorandum

On January 14, 1997, High View and United Golf entered into a registration rights agreement and subscription agreement (the "Purchase Agreements"). *Id.* at ¶ 13. Pursuant to the terms of those agreements, High View purchased two 10% Subordinated Notes (the "Notes") and 511,770 shares of United Golf common stock (the "Stock") for a total price of $1 million. *Id.* The United Golf Notes and Stock are securities regulated by the Securities Act of 1933 and the Securities Exchange Act of 1934. *Id.* at ¶ 14.

Prior to plaintiffs' investment in United Golf, defendants provided plaintiffs with an Offering Memorandum dated December 11, 1996 (the "Offering Memorandum"). *Id.* at ¶ 15. This document stated, in part, that

[t]he Principal business strategy of the Company is to acquire high quality golf courses and to lease the golf courses to the Seller or their affiliate or other qualified operator. The Company believes that a multiple independent lessee structure, together with substantial industry knowledge, experience and relationships within the golf community of management of the Company and the initial lessees, will permit United Golf to effectively target and acquire high quality golf courses, including those which might not otherwise be available for sale.... To finance the acquisition and ownership of golf properties, the Company contemplates engaging in an IPO of shares of Common Stock of the Company and using proceeds therefrom to support the Company's acquisition of golf properties.

Offering Memorandum at 8.

The document further provided that

[t]he Company has identified an original group of management companies with whom it intends to negotiate for the pur-

chase of golf courses they manage .... Concurrent with the preparations for the IPO and developing the aforementioned acquisition base, current management plans to identify and recruit experienced and skilled individuals from the golf and REIT industries to become part of the senior management group for the Company.

*Id.* at 12–13.

### B. The Defendants' Post–Offering Conduct

On January 13, 1998, nearly one year after plaintiffs entered into the Purchase Agreements, High View presented William Hall with a written offer to assist United Golf in raising an additional $8.5 million of capital, in exchange for additional equity in the company. Amended Complaint at ¶ 27. This offer was contingent upon High View controlling the management of United Golf and plaintiffs' participation in negotiations with underwriters for an IPO. *Id.* William Hall assured plaintiffs that he would take their offer to the Board of Directors and take the appropriate steps toward concluding an agreement with High View. *Id.* Hall, however, did not inform the Board of Directors of plaintiffs' January 13, 1998 offer. *Id.* at ¶ 28.

Two weeks later, on January 28, 1998, several of plaintiffs' officers met with William Hall and entered into an understanding concerning the terms of an upcoming United Golf offering of securities and for High View's further funding of United Golf's operations. *Id.* at ¶ 29. At the same meeting, plaintiffs informed William Hall that United Golf was in default on interest payments due under the Notes previously issued to High View. *Id.* By this time, United Golf was "on the brink of insolvency and financial collapse." *Id.* at ¶ 30.

Once again, William Hall assured plaintiffs' officers that he would take steps to have United Golf consummate a transaction with High View. *Id.* Nevertheless, when he returned to United Golf's Maryland headquarters, Hall did not advise the Board of Directors, nor anybody else at the company, of the understanding he had reached with plain-

tiffs. *Id.* On February 11, 1998, William Hall met for a third time with plaintiffs' officers in New York to discuss a proposed securities offering and additional High View financing. Following the meeting, Hall again failed to report his discussions with High View to United Golf's Board of Directors. *Id.* at ¶¶ 31–32.

On February 20, 1998, Karen Hall resigned from United Golf's Board of Directors. *Id.* at ¶ 34. Following his wife's resignation, William Hall contacted Peter Powers, the chairman of the High View Capital Corp and general partner of The High View Fund, L.P., to arrange a meeting for February 21, 1998 to revise United Golf's agreement with plaintiffs. *Id.* at ¶ 35. However, on February 21, 1998, Hall telephoned those in attendance at the meeting and informed them that, on the advice of his attorney, he would not appear. *Id.* at ¶ 36.

On March 2, 1998, United Golf's shareholders voted to remove William Hall as Chief Executive Officer and director. *Id.* at ¶ 37. Since that date, United Golf has continued to exist as a corporation without operations and has not engaged in any business activities. *Id.* United Golf has never executed an IPO and an IPO is not planned; nor has the company acquired any golf courses. *Id.* at ¶ 38.

### C. *Defendants' Use of United Golf Funds*

In late December 1997 and early January 1998, the Halls traveled to London at United Golf's expense. *Id.* at ¶ 24. William Hall told plaintiffs' officers that the purpose of his trip to London was to meet with potential investors. *Id.* However, he met with only one individual who did not have any serious intentions of investing in United Golf. *Id.* The Halls instead used the trip for personal business and recreation. *Id.*

Additionally, on ten occasions between December 24, 1997 and February 26, 1998, the Halls used checks drawn on United Golf's checking account to pay their personal credit card balance. *Id.* at ¶ 40. Then, on February 26, 1998, defendants used United Golf's checking account to make a $1,024.51 payment on their personal automobile and to make a $50,000 payment to William Hall for

his personal use. *Id.* Two more checks were drawn on the United Golf checking account on March 2, 1998—a $5,000 payment to the Halls' personal attorney, and an $8,000 payment to William Hall's secretary in excess of her usual payroll. *Id.* These payments were made above and beyond William Hall's board-authorized salary. *Id.*

By mid-March 1998, plaintiffs entered into a series of agreements with United Golf and its officers and other investors whereby (1) plaintiffs acquired United Golf's contractual rights in three prospective golf properties; (2) plaintiffs waived United Golf's defaults under the Notes and reduced the principal amount due under the Notes; (3) plaintiffs released the Company's newly-elected chairman and president and its outside director from certain liabilities; and (4) plaintiffs agreed, at the insistence of United Golf, to purchase United Golf securities from others who had invested in the company. *Id.* at ¶ 48. Between March 11, 1998 and May 27, 1998, plaintiffs spent $774,934 buying securities from other investors in United Golf. *Id.* at ¶ 49.

Plaintiffs seek to recover the $1 million that they paid for the Notes and common stock in January 1997, the $774,934 that they paid between March and May 1998 to repurchase United Golf securities from other investors, as well as costs, attorney's fees, and unspecified incidental damages.

## II. Standard of Review Under Rule 12(b)(6)

In considering a Rule 12(b)(6) motion to dismiss, a district court must limit itself to "facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 661 (2d Cir. 1996). Dismissal of a complaint pursuant to Rule 12(b)(6) is proper "only where it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Scotto v. Almenas,* 143 F.3d 105, 109–10 (2d Cir.1998) (quoting *Branham v.. Meachum,* 77 F.3d 626, 628 (2d Cir.1996)) (internal quotations

omitted). "The task of the court in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984)). Thus, in deciding such a motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the non-movant's favor. *See Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir.1998). Nevertheless, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted).

## III. Discussion

### A. *The Securities and Common Law Fraud Claims*

In their first claim, plaintiffs allege that the Halls made certain misrepresentations in the Offering Memorandum, in violation of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5. Plaintiffs' second claim, which alleges common law fraud, arises from the same operative facts.

#### 1. *Pleading Reliance*

■ Reasonable reliance is an element required of claims under § 10(b) and Rule 10b–5, *see Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir.1996) (citing, *inter alia*, *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994)), and under New York common law. *See id.* (citing *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833 (1958)); *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir.1991). To determine whether a plaintiff's reliance

on an alleged misstatement was reasonable, a court may, on a motion to dismiss, examine the text of the document at issue, including any cautionary language contained therein. *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5–9 (2d Cir.1996); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761–63 (2d Cir.1991); *Hinerfeld v. United Auto Group*, 97 Civ. 3533, 1998 WL 397852, at *4 (S.D.N.Y. July 15, 1998); *Schoenhaut v. American Sensors, Inc.*, 986 F.Supp. 785, 792–93 (S.D.N.Y.1997). For, "the 'central issue ... is not whether the particular statements taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities].'" *Olkey*, 98 F.3d at 5 (citing *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir.1990)) (modifications in original).

■ Plaintiffs contend that in the Offering Memorandum,[1] the Halls misrepresented, *inter alia*, "their experience [and] the knowledge and relationships of [United Golf's] officers in the golf industry." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 2. Plaintiffs cite to the following passage:

> The Company believes that a multiple independent lessee structure, together with substantial industry knowledge, experience and relationships within the golf community of management of the Company and the initial lessees, will permit United Golf to effectively target and acquire high quality golf courses, including those which might not otherwise be available for sale.

Offering Memorandum at 8. Isolated from the remainder of the offering document, this sentence might (albeit, improbably) have given an investor the impression that the company's then-existing management had "sub-

---

**1.** The Offering Memorandum was not attached to the Complaint, but was submitted as Exhibit A to Defendants' Memorandum of Law in Support of Motion to Dismiss. Nevertheless, the document is properly considered on this motion because it is integral to plaintiffs' securities and common law fraud claims. *See I. Meyer Pincus*, 936 F.2d at 762; *Field v. Trump*, 850 F.2d 938, 949 (2d Cir.1988); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1327 (1990) (when "plaintiff fails to introduce a pertinent document as part of [its] pleading, defendant may introduce the exhibit as part of [its] motion attacking the pleading").

stantial industry knowledge, experience and relationships within the golf community."

However, other passages in the Offering Memorandum made clear that United Golf's management did not then possess the desired industry knowledge, experience, and relationships. Rather, the company intended to recruit other individuals with these qualities to join as management: "Concurrent with the preparations for the IPO and developing the aforementioned acquisition base, current management plans to identify and recruit experienced and skilled individuals from the golf and REIT industries to become part of the senior management group for the company." *Id.* at 13. Moreover, the Offering Memorandum included biographies of United Golf's three officers, detailing their educational and professional backgrounds. *See id.* at 19–21. Any incorrect inferences that an investor might have drawn concerning the knowledge and expertise of the company's management would have been corrected by these biographies, which plaintiffs do not allege to be false or misleading. Considering the Offering Memorandum in its entirety, plaintiffs could not reasonably have been misled concerning the knowledge or experience of United Golf's officers.

Defendants also argue that in light of cautionary language that was included in the Offering Memorandum, plaintiffs could not have reasonably relied on the offering document's representations concerning United Golf's planned IPO or its plan to acquire golf properties. *See* Defendants' Memorandum of Law in Support of Motion to Dismiss ("Def.'s Mem.") at 9–12. I need not reach this issue because, as explained below in Section III.A.2, plaintiffs have failed adequately to plead scienter with respect to these alleged misrepresentations.

### 2. *Pleading Scienter*

In addition to alleging that the Halls misrepresented their knowledge and experience in the golf industry, plaintiffs claim that defendants misrepresented that (1) there would be an IPO; (2) the $1 million proceeds of the offering would be sufficient to accomplish United Golf's purposes as described in the Offering Memorandum; (3) United Golf would seek out and acquire golf properties; and (4) the proceeds of the plaintiffs' $1 million investment would be used for the purposes identified in the Offering Memorandum. *See* Amended Complaint at ¶¶ 16, 18, 52–54.

■ Rule 9(b) requires that in all allegations of fraud, including actions under § 10(b) and Rule 10b–5, the circumstances constituting the fraud must be stated with particularity. With respect to pleading scienter, Rule 9(b) requires that plaintiffs "allege facts that give rise to a strong inference of fraudulent intent." *Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996) (citing *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995)). This strong inference of fraudulent intent can be established either (1) "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness"; or (2) "by alleging facts to show that defendants had both motive and opportunity to commit fraud." [2] *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994); *see San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 813 (2d Cir.1996); *Acito,* 47 F.3d at 52.

### a. *Strong Circumstantial Evidence of Fraudulent Intent*

Plaintiffs do not plead facts that constitute strong circumstantial evidence of the

---

**2.** The Private Securities Litigation Reform Act of 1995 ("PSLRA") codifies language from the Second Circuit standard of pleading scienter: A complaint in all federal securities fraud actions must now "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The courts that have interpreted this provision are in disagreement as to whether averments of "motive and opportunity" remain sufficient to plead scienter, or whether the PSLRA imposes a higher standard which is satisfied only by allegations of facts that consti-

tute strong circumstantial evidence of conscious misbehavior or recklessness. *Compare Novak v. Kasaks,* 997 F.Supp. 425, 429–30 (S.D.N.Y.1998); *In re Baesa Sec. Litig.,* 969 F.Supp. 238, 239–242 (S.D.N.Y.1997); *and Norwood Venture Corp. v. Converse Inc.,* 959 F.Supp. 205, 208 (S.D.N.Y. 1997), *with In re Health Management, Inc. Securities Litig.,* 970 F.Supp. 192, 200–201 (E.D.N.Y. 1997); *and Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1251–57 (N.D.Ill.1997). Because plaintiffs' pleadings do not satisfy even the pre-PSLRA motive and opportunity standard, I need not address this issue.

requisite scienter.[3] Indeed, the Complaint is devoid of *any* facts which even remotely suggest that at the time that the Offering Memorandum was circulated, defendants knew or were reckless in failing to know that any of their statements were false or misleading. Neither plaintiffs' conclusory allegations of the Halls' knowledge and intent, nor their averments that some future events discussed in the Offering Memorandum did not come to pass, support an inference of fraud. *See generally Shields*, 25 F.3d at 1128–29. The sufficiency of plaintiffs' pleadings under Rule 9(b), therefore, turns on their averments of motive and opportunity.

### b. *Motive and Opportunity*

■ It is not disputed that as officers and directors of United Golf, defendants had the opportunity to affect the content of the Offering Memorandum. *See Salinger v. Projectavision, Inc.*, 934 F.Supp. 1402, 1414 n. 8 (S.D.N.Y.1996); *see also San Leandro*, 75 F.3d at 813 (in suit against company and its directors "[t]here is no doubt that defendants as a group had the opportunity to manipulate the price [of the company's] stock"). Plaintiffs' averments of a motive to defraud are, however, insufficient. The alleged motive must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields*, 25 F.3d at 1130.

Applying this standard, the Court of Appeals has rejected such allegations of motive as: (1) that defendant company was motivated to justify its investment by falsely representing the profitability of that investment, *Chill*, 101 F.3d at 268; (2) that defendants were motivated by a desire to maintain their company's credit rating, *San Leandro*, 75 F.3d at 813–14; (3) that defendants were motivated to defraud the public because an inflated stock price would increase their compensation, *Acito*, 47 F.3d at 54; and (4) that defendants desired to protect their executive compensation and the prestige they enjoyed as corporate officers. *Shields*, 25 F.3d at 1130. In *Acito*, the court further held that averments of "unusual" insider trading occurring shortly after a misrepresentation is made may satisfy the standard for pleading scienter, but the allegation that a corporate officer sold ten percent of his common stock holdings does not sufficiently state a motive to defraud. 47 F.3d at 54.

Plaintiffs contend that the Halls' motive for making the alleged misrepresentations in the Offering Memorandum was to obtain funds which they intended to spend on personal expenses. If plaintiffs had averred that defendants made personal use of a substantial portion of United Golf's funds shortly after soliciting plaintiffs' investment, then their pleadings might have been adequate. The facts alleged in the Complaint, however, are not nearly so compelling.

The Complaint avers that of the nearly $1,725,000 which was invested in the company ($1 million by plaintiffs), defendants spent less than $125,000 on personal expenses, and they did so approximately *one year* after defendants invested in United Golf. These allegations of misconduct are simply too far removed from plaintiffs' solicitation of investments through the Offering Memorandum to create the requisite inference of scienter.[4] A contrary result would eviscerate the protec-

**3.** The scienter element of both Rule 10b–5 and common law fraud is the same: The misrepresentations must have been made recklessly or with knowledge of their falsity. *See Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1496 (2d Cir.1992); *AUSA Life Ins. Co. v. Ernst & Young*, 991 F.Supp. 234, 252 (S.D.N.Y.1997); *Baesa*, 969 F.Supp. at 241 (citing cases); *Curiale v. Peat, Marwick, Mitchell & Co.*, 214 A.D.2d 16, 630 N.Y.S.2d 996, 1002–03 (1st Dep't 1995). The PSLRA imposes a marginally higher scienter standard for forward-looking statements, requiring proof that the statements were made with "actual knowledge" of their falsity. 15 U.S.C.A. § 78u–5(c)(1)(B)(i). However, it need not be de-

termined whether the misrepresentations at issue here qualify as forward-looking statements because plaintiffs have failed adequately to plead the lower scienter standard.

**4.** In fact, the Complaint alleges that William Hall expended United Golf's funds between December 24, 1997 and March 2, 1998 "in contemplation of his imminent departure from the company." Amended Complaint at ¶ 42. This allegation contradicts plaintiffs' argument that defendants had intended to make these allegedly improper expenditures when the Offering Memorandum was prepared in December 1996.

tions afforded by Rule 9(b), as any shareholder could parlay a claim for misuse of corporate assets into one for securities fraud. Accordingly, plaintiffs' pleadings do not satisfy the standard for alleging "motive and opportunity" under Rule 9(b).

### 3. Summary of Federal Securities and Common Law Fraud Claims

■ With respect to the Offering Memorandum's statements concerning the knowledge and expertise of United Golf's management, plaintiffs have not adequately pled the element of reasonable reliance. And, with respect to the Offering Memorandum's other alleged misrepresentations, plaintiffs have not satisfied Rule 9(b)'s standard for pleading scienter. Additionally, because plaintiffs have not properly pled any primary violation of the federal securities laws, their derivative claim for "controlling person" liability pursuant to § 20(a) must be dismissed. See Moss v. Morgan Stanley, Inc., 719 F.2d 5, 16–17 (2d Cir.1983); Press v. Chemical Inv. Servs. Corp., 988 F.Supp. 375, 390 (S.D.N.Y.1997); Primavera Familienstiftung v. Askin, 95 Civ. 8905, 1996 WL 580917, at *2 (S.D.N.Y. Oct.9, 1996). Therefore, defendants' motion to dismiss is granted with respect to claims one (violations of § 10(b), § 20(a), and Rule 10b–5) and two (common law fraud).

### B. Plaintiffs' Delaware Blue Sky Law Claim

■ Defendants advance only one argument concerning plaintiffs' third claim, which alleges a violation of § 7323 of the Delaware Securities Act, 6 Del. C. § 7323. They contend that the claim should be dismissed pursuant to Rule 9(b) because it concerns the same operative facts as claims one

and two—i.e., that defendants made certain misrepresentations in the Offering Memorandum. This argument ignores at least one important distinction between § 7323 and plaintiffs' other fraud-based claims: The Delaware statute does not require a plaintiff to prove scienter; instead, the statute permits the defendant to prove, as an affirmative defense, that he did not know or was not negligent in failing to know of the misrepresentation. See 6 Del. C. § 7323(a)(2). Thus, contrary to defendants' contention, the dismissal of claims one and two does not require a dismissal of claim three.[5] Defendants' motion to dismiss is therefore denied with respect to plaintiffs' third claim.

### C. Plaintiffs' Breach of Fiduciary Duty Claim

■ With respect to plaintiffs' fourth claim, which alleges a breach of fiduciary duty, defendants inexplicably argue that the Complaint is deficient for failing to plead that the Halls' use of United Golf monies was unauthorized. The Complaint plainly avers that the Halls paid for personal expenses on United Golf's checking account, identifies each expenditure, and alleges that the expenditures were above and beyond William Hall's board-authorized salary. Based on these allegations, plaintiffs have adequately pled that the Halls made unauthorized use of United Golf funds in contravention of their duty of loyalty under Delaware law.[6] See generally Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 360–361 (Del.1993) (discussing fiduciary duties of corporate directors). Defendants' motion to dismiss plaintiffs' fourth claim for breach of fiduciary duty is therefore denied.

---

**5.** One of defendants' alleged misrepresentations was that United Golf would use High View's $1 million investment for the specific purposes that were identified in the Offering Memorandum. See Offering Memorandum at 18. Defendants do not argue that plaintiffs' reliance on this representation was unreasonable. Thus, even assuming, arguendo, that reasonable reliance is an element of a § 7323(a)(2) claim, defendants' motion to dismiss claim three would be denied.

**6.** A federal court adjudicating state law claims must apply the forum state's choice of law principles. See Klaxon Co. v. Stentor Elec. Mfg. Co.,

313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir.1989). Pursuant to New York choice of law principles, a breach of fiduciary duty claim is governed by the law of the relevant company's state of incorporation. See Walton v. Morgan Stanley & Co., 623 F.2d 796, 798 n. 3 (2d Cir. 1980); Katz v. Emmett, 226 A.D.2d 588, 641 N.Y.S.2d 131, 132 (2d Dep't 1996); Hart v. General Motors Corp., 129 A.D.2d 179, 517 N.Y.S.2d 490, 493 (1st Dep't 1987). As United Golf is a Delaware corporation, Delaware substantive law governs plaintiffs' breach of fiduciary duty claim.

### D. Plaintiffs' Unjust Enrichment Claim

Defendants' argument concerning plaintiffs' fifth claim, which alleges unjust enrichment, is also based on an unduly restrictive reading of the Complaint. Plaintiffs allege that the Halls unjustly enriched themselves "[b]y negotiating in bad faith, and by not disclosing important business information to plaintiffs and by using High View's $1 million for the individual defendants' personal use and aggrandizement." Amended Complaint at ¶ 81. Defendants purport not to understand "(1) what was negotiated, (2) what constitutes bad faith, (3) what 'important business information' was not disclosed, or (4) why it was that Bill Hall could not, as President and CEO of United Golf reimburse himself for corporate expenses, approve payments for staff personnel, or make other necessary or appropriate payments." Def.'s Mem. at 8. The Halls contend that as a result of these perceived ambiguities, plaintiffs' unjust enrichment claim does not satisfy the liberal pleading standard of Fed.R.Civ.P. 8(a). Defendants are directed to read paragraphs 21 through 40 of the Complaint, which set forth in detail the conduct that is the subject of plaintiffs' unjust enrichment claim. Defendants' motion to dismiss is denied with respect to plaintiffs' fifth claim.

### E. Plaintiffs' Conversion Claim

In their sixth claim, plaintiffs allege that defendants converted the $1 million that High View invested in United Golf. The parties dispute whether this claim is governed by New York or Delaware law. I need not decide this issue, because the laws of both states support the dismissal of plaintiffs' conversion claim.

Under Delaware law, "an action for conversion of money will lie only where there is an obligation to return the identical money delivered by the plaintiff to the defendant," not where "an indebtedness may be discharged by the payment of money generally." *Goodrich v. E.F. Hutton Group, Inc.,* 542 A.2d 1200, 1203 (Del.Ch.1988) (internal quotations omitted). Similarly, under New York law, an action for conversion of money will lie where "there is a specific, identifiable fund and an obligation to return or otherwise

treat in a particular manner the specific fund in question." *Manufacturers Hanover Trust Co. v. Chemical Bank,* 160 A.D.2d 113, 559 N.Y.S.2d 704, 712 (1st Dep't 1990); *see also Republic of Haiti v. Duvalier,* 211 A.D.2d 379, 626 N.Y.S.2d 472 (1st Dep't 1995). "More particularly, if the allegedly converted money is incapable of being described or identified in the same manner as a specific chattel, it is not the proper subject of a conversion action." *Interior by Mussa, Ltd. v. Town of Huntington,* 174 Misc.2d 308, 664 N.Y.S.2d 970, 972 (2d Dep't 1997).

Plaintiffs seek only to recover $1 million—the amount that they invested in United Golf. Because plaintiffs do not claim ownership of a "specifically identifiable, segregated [$1 million]," *Chemical Bank,* 559 N.Y.S.2d at 712, they fail to state a claim for conversion of money. Defendants' motion to dismiss plaintiffs' sixth claim is therefore granted.

### F. Plaintiffs' Breach of Contract Claim

In their seventh and final claim, plaintiffs allege that "[t]hrough the offering memorandum and Purchase Agreements, plaintiffs entered into a contract with United Golf on or about January 14, 1997," Amended Complaint at ¶ 87, and that "[d]efendants breached the contract with High View because after January 14, 1997, United Golf did not review and inspect golf properties, retain personnel, and plan an IPO." *Id.* at ¶ 90.

Unless a director binds herself individually, she cannot be held personally liable on the contracts of her corporation, although she may be liable for tortious interference with the corporation's contracts if she exceeds the scope of her corporate authority in causing the breach of those contracts. *See International Ass'n of Heat and Frost Insulators and Asbestos Workers Local Union 42 v. Absolute Envtl., Servs., Inc.,* 814 F.Supp. 392, 405 n. 12 (D.Del.1993); *Transportes Aereos de Angola v. Ronair, Inc.,* 693 F.Supp. 102, 111 (D.Del.1988); *Shearin v. E.F. Hutton Group, Inc.,* 652 A.2d 578, 590 (Del.Ch.1994); *Grand Ventures, Inc. v. Paoli's Restaurant, Inc.,* 95C–03–013, 1996 WL 30022, at * 3 (Del.Super.Jan.4, 1996);

accord *Key Bank of New York v. Grossi,* 227 A.D.2d 841, 642 N.Y.S.2d 403, 404 (3d Dep't 1996); *Lerman v. Northeast Permanente Med. Group, P.C.,* 212 A.D.2d 672, 622 N.Y.S.2d 764, 764 (2d Dep't 1995). Because (1) plaintiffs' seventh claim is for breach of contract, rather than for tortious interference with contract, and (2) plaintiffs do not allege that defendants signed any contract (in either their personal or corporate capacity), plaintiffs' seventh claim must be dismissed. Thus, defendants' motion to dismiss is granted with respect to plaintiffs' seventh claim.

## IV. Conclusion

■ For the reasons stated above, defendants' motion to dismiss is granted with respect to plaintiffs' first, second, sixth, and seventh claims, and denied with respect to plaintiffs' third, fourth, and fifth claims. Plaintiffs' first and second claims are dismissed with leave to amend,[7] but its sixth and seventh claims are dismissed with prejudice. If plaintiffs elect to amend their pleadings, they must do so no later than October 15, 1998. A conference is scheduled for October 16, 1998 at 4:30 p.m.

SO ORDERED:

---

7. The PSLRA requires that "upon final adjudication" of certain causes of actions, including those arising under § 10(b), the court must determine whether the parties and their attorneys complied with Fed.R.Civ.P. 11(b). 15 U.S.C. § 78u–4(c)(1); *see Simon DeBartolo Group, L.P. v. The Richard E. Jacobs Group, Inc.,* 985 F.Supp. 427, 429–30 (S.D.N.Y.1997). As dismissal with leave to amend does not constitute a final adjudication of an action, *cf. Richardson Greenshields Secs., Inc. v. Lau,* 825 F.2d 647, 650 (2d Cir.1987), I need not make the required determination at this time.