MBIA
Insurance Corporation, Plaintiff,

against
JPMorgan Securities LLC (f/k/a Bear, Stearns &
Co., Inc.), Defendant.


64676/2012

Quinn Emanuel Urquhart & Sullivan, LLP 
Attorneys for Plaintiff
By: Peter E. Calamari, Esq.
Richard I. Werder,
Jr., Esq.
Marc L. Greenwald, Esq.
Thomas J. Lepri, Esq.
51 Madison
Avenue, 22nd Floor
New York, New York 10010 
Greenberg Traurig, LLP
Attorneys for Defendant
By: Richard A.
Edlin, Esq.
Anastasia A. Angelova, Esq.
William A. Wargo, Esq.
Daniel
E. Clarkson, Esq. 
200 Park Avenue
New York, New York 10166


Alan D. Scheinkman, J.

In this action to recover damages for fraudulent concealment, Defendant J.P.Morgan
Securities LLC (f/ka Bear, Stearns & Co., Inc.) ("Defendant" or "Bear Stearns")
moves, for the second time, for summary judgment dismissing the Complaint of Plaintiff
MBIA Insurance Corporation ("MBIA" or "Plaintiff"). The action arises out of a
mortgage securitization transaction in which MBIA served as the insurer, Bear Stearns as
the underwriter, and GMAC Mortgage Corporation ("GMACM") as the sponsor.
This Court has already issued two significant prior Decisions and Orders which
inform the disposition of the present motion, both of which are incorporated by reference
herein. Familiarity with these two prior Decisions and Order is assumed for purposes of
this Decision and Order.
By Decision and Order dated and entered May 6, 2014 (the "May 2014 Decision"),
this Court granted summary judgment to Bear Stearns on the cause of action asserted in
the original Complaint — actual fraud — on the ground that there was no
evidence to support the claim that MBIA relied upon the intentional misrepresentations
made by Bear Stearns. However, in doing so, the Court acknowledged that MBIA had
presented evidence which suggested that there was "considerable merit to Plaintiff's
unpleaded claim that Bear Stearns had a duty to disclose which it breached, giving rise to
a claim for fraudulent concealment" (May 2014 Decision at 37 [footnote omitted]).
Because of the existence of potentially viable, though unpleaded, claims, the Court
dismissed the then extant Complaint with the proviso that Plaintiff was granted leave to
move for permission to amend its Complaint.
Plaintiff moved for leave to amend and, by Decision and Order dated September 18,
2014 (the "September 2014 Decision"), this Court granted MBIA leave to interpose an
Amended Complaint containing a cause of action for fraudulent concealment and that
cause of action only. 
To ameliorate any prejudice to Bear Stearns from the allowance of the amendment,
the Court re-opened discovery so that the parties could exchange documents and
deposition testimony focused on the new issues presented by the amendment. Discovery
was essentially completed by June 26, 2015 when the Court held a Trial Readiness
Conference. At that Conference, counsel for Bear Stearns expressed the intention to
move for summary judgment and the contours of a briefing schedule were laid out. The
present motion for summary judgment was filed on August 31, 2015. Following the
service and filing of opposition and reply papers, the Court held oral argument on
January 30, 2016.
THE FRAUDULENT
CONCEALMENT CLAIM
The background underlying MBIA's
claim has already been described in the Court's prior Decisions. It is undisputed that, as a
condition for the issuance of an insurance policy for a securitization transaction known
as GMACM 2006 HE4, MBIA required that it be provided with a due diligence report
from a third-party firm, Mortgage Data Management Corporation ("MDMC"), which was
tasked to review the files of a sample of loans in the pool to assess the extent to which
the loans presented exceptions to credit-related or compliance-related underwriting
guidelines. MDMC began its work in early September, 2006 but by September 18, 2006,
MDMC had found, and Bear Stearns was informed that, there were substantial problems.
Efforts were made, in particular by John Mongelluzzo of Bear Stearns, to address the
problems but ultimately, with the closing just hours away, Mongelluzzo altered the
spreadsheets that MDMC had sent him, and these altered spreadsheets were sent by Bear
Stears to MBIA. [*2]Unfortunately for MBIA, its
personnel did not read or review the altered spreadsheets prior to closing. The Court
granted MBIA summary judgment on its actual fraud claim, ruling that there was no
evidence that anyone at MBIA as much as glanced at the content of the spreadsheets and
that no one at MBIA actually relied on the spreadsheets or the e-mail that accompanied
them.
A. The Cause of Action Alleged
In its fraudulent concealment claim, MBIA alleges that Bear Stearns knew as early as
September 18, 2006 (the same day that MBIA was named as the insurer) that a review
conducted by the third-party due diligence firm, had revealed substantial issues with the
collateral pool of the proposed securitization transaction. Bear Stearns, it is alleged, knew
that MBIA needed to know whether the due diligence results showed any issues with the
collateral pool and that the receipt of such information was a condition to MBIA's
issuance of insurance for the securitization. Instead of sharing MDMC's reports of
September 18, 19, 20 or 25, 2006, Bear Stearns withheld this information from MBIA
(Amended Complaint, ¶ 68), even though the MDMC reports would have been
material to MBIA's decision to offer insurance on the transaction (id.,
¶¶ 69-70). MBIA asserts that Bear Stearns withheld the information with the
intent to defraud MBIA and, further that Bear Stearns' fraudulent intent is evidenced by
its sending of an altered and "seemingly innocuous" due diligence report on September
27, 2006 (id., ¶¶ 70-71).
MBIA alleges that Bear Stearns had a duty to disclose the true results of the due
diligence due to the contractual relationship between Bear Stearns and MBIA and, in
particular, Bear Stearns' agreement to share MDMC's due diligence results with MBIA
(id., ¶ 72). MBIA also maintains that Bear Stearns owed a duty to disclose
the due diligence results because of Bear Stearns' superior knowledge that was not
known to MBIA (id., ¶ 73), because of Bear Stearns' misleading, partial
disclosures (id., ¶ 74) and because Bear Stearns engaged in active
concealment (id., ¶ 75). MBIA alleges that it relied to its detriment on Bear
Stearns' alleged omissions of material facts and, so relying, issued the insurance policy,
leading eventually to MBIA's payment of claims on the policy of some $188 million
(id., ¶¶ 76-77).
B. Relevant Evidentiary Facts
Bear Stearns was the lead securities underwriter for the transaction. As lead
underwriter, Bear Stearns was involved in, among other things, soliciting bids from
monoline insurers, providing insurers with the information needed to bid, working with
GMACM to structure and price the transactions and select the insurer, coordinating the
flow of documents and information among those involved, and retaining a third-party
due diligence firm.
Bear Stearns initiated a process of inviting insurers to bid on the opportunity to
insure the transaction, including the sharing of data with the bidders. On September 11,
2006, Charles Mehl of Bear Stearns sent MBIA the preliminary "loan tape", a data file
which lists the attributes for the loans that would serve as the collateral for the
securitization. Mehl sent a revised tape on September 13, 2006 and explained that MBIA
had received updated FICO scores which were reflected in the revised tape. On
September 15, 2006, Mehl sent a revised loan level and report, explaining that the
"current rates for the teasers were changed to the Fully indexed rate from the teased
rate."
On September 18, 2006, a Bear Stearns' e-mail identified MBIA as the insurer for the
transaction. The next day, Lauren Desharnais of MBIA sent Robert Durden of Bear
Stearns a [*3]proposed bid letter formally presenting
conditions for MBIA's bid. It was expected by MBIA that Bear Stearns would review the
bid letter with GMACM and Bear Stearns did so. On September 19, 2006, Durden
advised Desharnais that, while GMACM had some comments on the bid letter, the
indications were that the deal was MBIA's. Comments on the bid letter were exchanged
all day between GMACM and MBIA but not directly, only with Durden of Bear Stearns
as intermediary, passing the information back and forth. After the final GMACM
comments were in, the MBIA representative, Lauren Desharnais, announced to the other
MBIA personnel involved, that MBIA had won the bid, the announcement being made in
an email sent at 9:42 p.m. on September 19, 2006.
The bid letter (the "Bid Letter") is dated September 19, 2006, was issued by
Desharnais and is addressed to Sanford J. Blitzer of GMACM. The Bid Letter addresses
various topics, including the premium to be paid, the ratings requirements, up-front
expenses, the underlying credit enhancement structure, structure assumptions, pool
assumptions, and proposed credit support. The Bid Letter contained the following
paragraph relevant to due diligence:
Diligence Requirements: GMAC Mortgage and Bear Stearns agree to share
loan file diligence results with MBIA.
The Bid Letter
also contained a provision regarding assumptions as to the
pool:
Pool Assumptions: This bid is based on the
accuracy of the data file provided to MBIA by Bear Stearns & Co. To the extent that
the ultimate pool differs from this on and/or the due diligence results prove materially
different collateral, our overcollateralization target and fee will change
accordingly.
The Bid Letter is not physically signed by
anyone.
John Mongelluzzo, a Managing Director of Bear Stearns'
capital markets department, coordinated Bear Stearns' due diligence efforts. Bear Stearns
commissioned the third party due diligence firm, MDMC, on September 8, 2006, before
MBIA was named as the insurer. The due diligence review was scheduled to take place
at GMAC's location in Horsham, Pennsylvania between September 13 and 15, 2006.
There is testimony that it was the market standard to have the underwriter contract with a
due diligence firm to conduct the due diligence review.
MDMC's Becky Balistriere sent an email to Mongelluzzo of Bear Stearns on
September 18, 2006 at 8:14 p.m. The email forwarded what Balistriere described as
"final reports." She stated:
There are a large number of fails outstanding at this point. GMAC had
been provided with fails on a loan level basis while we were at the site last week. As of
now no cures have been received in our office from them. Please review and advise of
any exceptions you may want to make as well as any comments/changes needed to the
upload.
The next day, September 19, 2006, at 1:42 p.m., Janet
Marrone of GMACM emailed Robert Durden of Bear Stearns that GMACM had advised
Mongelluzzo that "GMACM considered the pool final with no drops." She added that it
was unreasonable to have received such an extensive report from MDMC late in the
previous day but that GMACM would review the report for valid exceptions and proceed
within the normal course of business. She wrote further:

 We asked John to let us know if there were any particular loans of concern to him,
but expect that much of the report is non-material. We haven't heard from John [*4]yet today, but I would like sign off from Bear that the pool
is final so that our analysts can begin to run the collateral tables (id., Ex.
22).

Durden sent this email to Jonathan Lieberman, a Senior
Managing Director at Bear Stearns, advising that there was a "[b]ig issue with the on-site
due diligence."

That same day, September 19, 2006, Mongelluzzo had told GMACM to "ignore the
credit findings and to resolve the compliance issues." At 1 p.m. that day, Durden sent out
an email in which he stated that "GMAC should have the compliance issues cleared up
this afternoon, which is what John M. asked them to focus on" (id., Ex. 26).
The discussions between Bear Stearns, GMACM and MDMC regarding the
resolution of due diligence issues on September 19 were taking place on the same day
that Durden, who was aware of the due diligence issues, was discussing the terms of the
Bid Letter with MBIA, who was not apprised of the problems. Also on September 19,
2006, Becky Balistriere of MDMC sent revised reports to Mongelluzzo, commenting that
these reports had "additional comments made per your earlier email" and reporting that
MDMC was continuing to "tweak" the formatting of certain fields as well as working
through the data comparison to fit what he was looking for. Further revised reports were
transmitted to Mongelluzzo on September 20, 2006.
Despite these efforts, on September, 21, 2006, Durden asked Mongelluzzo by email:
"Do you have a clean dd report for the GMAC deal." Mongelluzzo responded: "not even
close, why." In reply to the question, Durden stated: "MBIA needs it, they are wrapping
the deal.". The next day, Friday, September 22, 2006, Durden emailed Mongelluzzo:
"Mongo, please send the cleaned up dd report for GMAC 06-HE4, or tell us who to
contact at MDMC for it, thanks."
On Monday, September 25, 2006, Victor Cascio of MDMC sent Mongelluzzo
"updated reports." He advised that MDMC was "able to clear an additional 23 loans from
the previous report, if you find other items that you decided to waive, please let me know
and I will make the corrections." The attached reports consisted of two Excel
spreadsheets, each with several worksheets, and each worksheet containing numerous
rows of data about the loan characteristics and the due diligence results. The file names
were "GMAC HE4-2006 MDMC DD Data File 092506.xls" and "GMAC HE4-2006
MDMC DD Issues 02506.xls."
On this record, as on the prior motion for summary judgment, there is no evidence
that Mongelluzzo sent these updated reports to anyone, whether it be anyone else at Bear
Stearns, anyone at MBIA, or anyone at all. Indeed, on September 26, 2006, the day after
Mongelluzzo received the updated reports from MDMC, Durden emailed Mongelluzzo
again: "Mongo, please send the due diligence report for this deal. We close Wednesday
morning and can't get the insurer to execute their agreement if we don't have a due
diligence report."
On September 27, 2006 — just a few hours before the closing —
Mongelluzzo sent two Excel spreadsheets to Durden via email. The text of the email
states: "I got these cleaned up as best I could. Still some data that is missing but most of
the holes have been filled in." The files were named "GMAC HE-4 MDMC DD Data
File 092506 II.xls" and GMAC "HE-4 MDMC DD Issues 092506 II.xls."
There is evidence that the spreadsheets that Mongelluzzo sent to Durden did not
contain certain information that was included in the spreadsheets that MDMC had sent to
Mongelluzzo, such as, inter alia, columns that showed failing credit and
compliance grades assigned by MDMC, columns with negative commentary about the
loans, and cells in which the text [*5]"Unacceptable
Compliance" was changed to "Acceptable".
On September 27, 2006, about an hour after receiving the email from Mongelluzzo,
Durden sent an email to Carl Webb and Desharnais of MBIA. Desharnais was a Director
in the New Business Group at MBIA and Webb was her supervisor. The email was not
sent directly to Theresa Murray, who was a director at MBIA responsible for credit risk
and chairing the Underwriting Committee for the 2006-HE4 Securitization.
The email was headed: "GMAC 2006-HE 4 DUE DIL REPORT." The text of the
email reads:
Attached is the due diligence report for the above deal, let me know if you
have any questions.
Attached to the email was one Excel
spreadsheet: "GMAC HE4-2006 MDMC DD Data File 092506 II.xls." Durden had
combined the two spreadsheets he had obtained from Mongelluzzo into one.
The closing of the transaction occurred on September 27, 2006 as scheduled. As this
Court previously held, there is no evidence that anyone at MBIA so much as glanced at
the purported due diligence report prior to closing. Accordingly, the Court held that
MBIA could not establish that it had relied upon a report which none of its employees
ever read, much less reviewed, prior to closing.
Additional facts will be addressed as part of the legal discussion.
THE SUMMARY JUDGMENT STANDARD
The proponent of a motion for summary judgment carries the initial burden of
production of evidence as well as the burden of persuasion (Alvarez v Prospect
Hosp., 68 NY2d 320 [1986]). The moving party must tender sufficient evidence to
demonstrate as a matter of law the absence of a material issue of fact.[FN1]
Failure to make that initial showing requires denial of the motion, regardless of the
sufficiency of the opposing papers (Winegrad v New York University Med.
Center, 64 NY2d 851, 643-644 [1985]; St. Luke's-Roosevelt Hosp. v American
Tr. Ins. Co., 274 AD2d 511 [2d Dept 2000]; Greenberg v Manlon Realty,
Inc., 43 AD2d 968 [2d Dept 1974]). Once the moving party has made a prima
facie showing of entitlement of summary judgment, the burden of production shifts
to the opponent, who must now go forward and produce sufficient evidence in
admissible form to establish the existence of a triable issue of fact or demonstrate an
acceptable excuse for failing to do so (Zuckerman v City of New York, 49 NY2d
557, 562 [1980]; Tillem v
Cablevision Sys. Corp., 38 AD3d 878 [2d Dept 2007]).
The court's main function on a motion for summary judgment is issue finding rather
than issue determination (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d
395 [1957]). Since summary judgment is a drastic remedy, it should not be granted where
there is any doubt as to the existence of a triable issue (Rotuba Extruders, Inc. v
Ceppos, 46 NY2d 223 [1978]). Thus, when the existence of an issue of fact is even
arguable or debatable, summary judgment should be denied (Stone v Goodson, 8
NY2d 8 [1960]; Sillman v Twentieth Century Fox Film Corp., supra). In
reviewing a motion for summary judgment, the Court must accept as true the evidence
[*6]presented by the nonmoving party and must deny the
motion if there is "even arguably any doubt as to the existence of a triable issue"
(Baker v Briarcliff School Dist., 205 AD2d 652, 661-662 [2d Dept
1994]).
THE STANDARD FOR A CLAIM OF
FRAUDULENT CONCEALMENT OF MATERIAL FACTS
It is well established that " [t]he mere nondisclosure of a material fact,
unaccompanied by some deceptive act, does not constitute fraud absent a confidential or
fiduciary relationship" (Sanford/Kissena Owners Corp. v Daral Props., LLC, 84 AD3d
1210, 1211 [2d Dept 2011], quoting First Keystone Consultants, Inc. v DDR Constr. Servs.,
74 AD3d 1135, 1138 [2d Dept 2010]). As the qualifying language in the quotation
implies, while mere nondisclosure, standing alone, is not generally actionable, if the
defendant does more than just stay silent and engages in deceptive acts, there are
circumstances under which liability may be imposed. "In business [transactions], an
affirmative duty to disclose material information may arise from the need to complete or
clarify one party's partial or ambiguous statement .... or from a fiduciary or confidential
relationship between the parties ....Such a duty may also arise .... where: (1) one party has
superior knowledge of certain information; (2) that information is not readily available to
the other party; and (3) the first party knows that the second party is acting on the basis
of mistaken knowledge" (Banque Arabe et Internationale D'Investissement v
Maryland Natl. Bank, 57 F3d 146, 155 [2d Cir 1995]).
An active concealment is substantively the same as an affirmative misrepresentation
(60 NY Jur 2d, Fraud and Deceit § 88). Active concealment implies purposeful
misrepresentation, i.e., the Defendant's affirmative attempt to hide something
(London v Courduff, 141 AD2d 803 [1st Dept 1988], lv dismissed 73
NY2d 809 [1988]). When there has been an active fraudulent concealment, a duty to
speak arises even in the absence of a confidential, fiduciary or contractual relationship
(Clement v Delaney Realty
Corp., 83 AD3d 881 [2d Dept 2011]; Haberman v Greenspan, 82 Misc
2d 263 [Sup Ct, Richmond County 1975]).
The elements for a cause of action of fraudulent concealment are: (1) an omission of
a material fact; (2) intent to defraud; (3) duty to disclose, (4) reasonable reliance on the
omission, and (5) damages suffered (Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 178
[2011]). The elements of fraudulent concealment are the same as the elements required
for fraudulent misrepresentation with one addition — it must be shown that "the
defendant had a duty to disclose material information and that it failed to do so" (P.T.
Bank Central Asia v ABN Amro Bank, N.V., 301 AD2d 373, 373 [1st Dept 2003]).
As with fraudulent misrepresentation, fraudulent concealment must be established by
clear and convincing evidence (Banque Arabe et Internationale D'Investissement v
Maryland Natl. Bank, supra, 57 F3d at 153).
BEAR
STEARNS' MOTION FOR SUMMARY JUDGMENT
In support of
its motion for summary judgment, Bear Stearns presents three principal arguments. First,
Defendant argues that there is no evidence that MBIA relied on Bear Stearns' "supposed
silence" in deciding to insure the transaction. Second, Defendant contends that any such
reliance would not be reasonable since MBIA, as a sophisticated business entity, had an
obligation to protect itself by doing its own investigation into the details of the
transaction. Third, Bear Stearns argues that it did not owe MBIA any affirmative duty to
disclose the results of the due diligence review. MBIA disputes all three
points.
[*7]THERE ARE
TRIABLE ISSUES OF FACT AS TO WHETHER BEAR STEARNS OWED MBIA A
DUTY TO DISCLOSE
The threshold issue is whether, as a matter of law, Bear Stearns did not owe MBIA
any duty to disclose material omitted facts. That issue turns in large measure on what
material facts are claimed by MBIA to have been withheld from it. As pleaded in the
Amended Complaint, MBIA alleges that, rather than sharing MDMC's reports of
September 18, 19, 20 or 25, 2006 with MBIA, Bear Stearns withheld this information,
despite evidence suggesting that MBIA was asking for the MDMC report. The Court
holds that, contrary to Bear Stearns' position, there are genuine issues of fact as to
whether Bear Stearns owed MBIA a duty to disclose both the MDMC reports as well as
the reasons why Bear Stearns had not forwarded them to MBIA and the actions of Bear
Stearns in altering the final MDMC reports rather than sending them along to
MBIA.
The general rule is that, "[i]n the absence of a contractual relationship or a
confidential or fiduciary relationship, a party may not recover for fraudulent concealment
of fact, since absent such a relationship, there is no duty to disclose" (900 Unlimited,
Inc. v MCI Telecom. Corp., 215 AD2d 227, 227 [1st Dept 1995]). While the
relationship between MBIA and Bear Stearns cannot conceivably be characterized as
confidential or fiduciary, there is evidence that supports the characterization of the
relationship as contractual, at least with respect to the MDMC reports.
MBIA transmitted the Bid Letter, essentially an offer to provide insurance on
specified terms, to Bear Stearns, as intermediary for GMACM. The MBIA offer called
for Bear Stearns and GMACM to share certain information — the loan file
diligence results — with MBIA. Bear Stearns was aware that the offer called for
Bear Stearns and GMACM to share the due diligence results with MBIA. There is
evidence that MBIA's offer — to provide insurance on specified terms, including
provision of the due diligence results — was accepted by both GMACM and Bear
Stearns.
The MBIA offer called for Bear Stearns and GMACM to share certain information
— the loan file diligence results — with MBIA. There is evidence that this
offer was accepted by both GMACM and Bear Stearns; Bear Stearns and GMACM
embarked on a due diligence process and ultimately shared information with MBIA.
Indeed, if the "loan file diligence results" mean the results developed by the third party
due diligence firm (MDMC), then it may be concluded, by not providing the final
MDMC product to MBIA, Bear Stearns failed in a contractual duty owing to MBIA.

While the Bid Letter does not specify the time by which the due diligence results
were to be shared, it may be implied that the results were to be shared within a reasonable
time (see, e.g., Savasta v 470 Newport Assocs., 82 NY2d 763 [1993]; Klein v Klein, 134 AD3d
1066 [2d Dept 2015]).
Similarly, while the Bid Letter does not define "loan file results," there is evidence in
this record that would support a finding that loan file due diligence results refers to the
findings and report of the third-party due diligence firm, independent of input from the
underwriter and/or seller. While Bear Stearns argues that the due diligence process is
"iterative", there are clear issues of fact as to the amount, if any, of input in, and control
over, the third party due diligence firm that the underwriter and seller were permitted or
expected to exercise. Moreover, there is no evidence that, after Mongelluzzo altered the
reports, he offered MDMC the opportunity to review and comment on his changes. Thus,
there is no evidence that MDMC approved or sanctioned, or [*8]would have approved or sanctioned, the reports as
submitted by Bear Stearns. In other words, no matter how "iterative" the process may
have been up to a point, the evidence on the record shows that the final work product
was turned over to MBIA without prior approval or consent of MDMC. No matter how
interactive the process had been prior to September 25, 2006, and no matter how willing
MDMC may have been to work with Bear Stears to clear issues prior to that date, once
MDMC's last report was in, Bear Stearns made more changes without input from
MDMC.
It may be readily inferred from the Bid Letter, and from evidence as to industry
practice, that the loan file diligence results that were supposed to be shared with MBIA
were the results of the review by the third-party due diligence firm, rather than results of
a due diligence review by Bear Stearns. Indeed, it would hardly make sense for the
process to involve a third-party due diligence firm if a due diligence review by an
underwriter was acceptable, at least a reasonable finder of fact could so conclude.
Moreover, the Court notes that, when Bear Stearns sent a revised "loan tape" on
September 13, 2006, the Bear Stearns employee specifically noted for MBIA that the
tape had been revised by Bear Stearns and briefly explained why it had been revised. It is
a question of fact as to whether Bear Stearns should either have sent the MDMC reports
to MBIA without alteration or whether Bear Stearns should have at least briefly noted
that it was revising the reports and explained why or whether Bear Stearns conduct, as it
was, was proper.
Bear Stearns argues that it was not a named party to the Bid Letter, since that
document was addressed to GMACM and was issued by MBIA and, therefore, it was not
bound to provide the MDMC information. However, that argument is much too facile
and ignores the reality of the transaction as it occurred. There is no dispute that the terms
of the bid (which found their way into the Bid Letter) included the requirement that both
Bear Stearns and GMACM agree to share the results of the loan file due diligence with
MBIA. That provision was not limited to GMACM; Bear Stearns was specifically named
as a party to the obligation to provide the due diligence results. The evidence shows that
the terms of MBIA's bid were disclosed to Bear Stearns, that Bear Stearns consulted with
GMACM as to those terms, negotiated changes, and then Bear Stears accepted those
terms. Hence, there is ample evidence, if not undisputed evidence, that Bear Stearns,
along with GMACM, agreed to share the due diligence file results with MBIA. Indeed,
there is deposition testimony from GMACM's transaction manager that it was Bear
Stearns' job in this transaction to send the due diligence results to MBIA. Further, there is
significant evidence that Bear Stearns served as the intermediary between MBIA and
MDMC, just as it served as the intermediary between MBIA and GMACM.
Furthermore, the evidence would support the view that Bear Stearns, even if it did
not perceive that it was acting in pursuit of its own contractual agreement with MBIA in
relation to the due diligence results, was acting as agent for GMACM. Bear Stearns does
not contest, nor could it, that GMACM had a contractual obligation to share the due
diligence results with MBIA. The evidence would support the view that Bear Stearns was
acting for GMACM in executing GMACM's responsibility with respect to due diligence.
It is well settled that an agent may be held liable for fraud committed by the agent in the
course of the agent's actions on behalf of a disclosed principle (see Laska v
Harris, 215 NY 554 [1915]). Thus, Bear Stearns can be held liable for fraud
committed by it in the course of its acting as agent for GMACM in regards to due [*9]diligence.
The Court does not accept Bear Stearns' contention that the Bid Letter, and its
obligation to share the due diligence results with MBIA, was superceded by other
documents. 
The first document upon which Bear Stearns relies is a letter agreement between
MBIA and GMACM relating to MBIA's premium and the fees of its accountant and
counsel (the "Premium Letter"), which was effective upon closing. Bear Stearns points
out that the Premium Letter contains a provision stating that it represents the parties'
agreement as to the subject matter and that there are no other promises or representations
made by the parties relative to the subject matter. But, as Bear Stearns points out, the
Premium Letter contains no reference whatsoever to due diligence; hence, the due
diligence obligations of the parties cannot be said to be part of the "subject matter" of the
Premium Letter. Indeed, the precise point of the lawsuit is that MBIA contends that it
would not have entered into the transaction at all had Bear Stearns not engaged in
fraudulent conduct in relation to due diligence. Further, to the extent that Bear Stearns
undertook on its own behalf to share the due diligence results with MBIA, the Premium
Letter did not recant that obligation since Bear Stearns was not a party to the Premium
Letter. Moreover, the Bid Letter specifically contemplated, among other things, that if
the due diligence results prove materially different collateral, the overcollateralization
target and fee will change accordingly. Thus, had the MDMC due diligence results been
shared, MBIA may have walked from the deal entirely prior to closing, in which case the
Premium Letter would not have been entered into or MBIA may have sought increases in
collateral or in its fees, in which event the Premium Letter may have had different
terms.
The second document relied upon by Bear Stearns is an agreement whereby MBIA
agreed to issue an insurance policy on the closing date (the "Insurance Letter"). While the
Insurance Letter is dated as of September 1, 2006, it, along with several of the other
documents referred to by Bear Stearns, provided for the obligations and rights of the
parties upon and after the closing of the transaction. None of these documents vitiate the
obligations of Bear Stearns to share due diligence results with MBIA as previously
agreed.[FN2]

There is an additional ground for the imposition of a duty to disclose the MDMC
reports, one which also was addressed in the May 2014 Decision (at 37-38):

 In addition, there may be a duty to disclose, which is not limited to parties in
privity of contract, when nondisclosure would lead the person to whom it was or should
have been made to forego action that might otherwise have been taken for the protection
of that person (Strasser v Prudential Sec., Inc., 218 AD2d 526 [1st Dept 1995]).
Here, a potential viable fraud claim may be predicated either upon the theory that Bear
Stearns had special knowledge not available to MBIA or that Bear Stearns' responses to
MBIA's requests for delivery of the due diligence information were misleading in that
they failed to disclose the problems known to Bear Stearns and/or failed to disclose that
the delivery was being delayed by Bear Stearns' effort to alter the results (see Williams v Sidley Austin
Brown & Wood, L.L.P., 38 AD3d 219 [1]st Dept 2007).


 Under the "special facts" doctrine, a duty to disclose arises "when one party's
superior knowledge of essential facts renders a transaction without disclosure inherently
unfair" (Pramer S.C.A. v
Abaplus Intl. Corp., 76 AD3d 89, 99 [1st Dept 2010]; Swersky v Dreyer and
Traub, 219 AD2d 321 [1st Dept 1996]. In Jana L. v West 129th Street Realty Corp. (22 AD3d 274
[1st Dept 2005]), the court ruled that the "special facts" doctrine is subject to
qualification:


 [This] doctrine requires satisfaction of a two-prong test: that the material fact was
information "peculiarly within the knowledge" of [defendant], and that the information
was not such that could have been discovered by [plaintiff] through the " exercise of
ordinary intelligence'" (Black v. Chittenden, 69 NY2d 665, 669, 511 N.Y.S.2d
833, 503 N.E.2d 1370 [1986], quoting Schumaker v. Mather, 133 NY 590, 596,
30 N.E. 755 [1892] ["if the other party has the means available to him of knowing ... he
must make use of those means, or he will not be heard to complain that he was induced
to enter into the transaction by misrepresentation"] (Jana L., 22 AD3d at
278).


 Bear Stearns agreed to provide the due diligence results to Plaintiff and it may be
inferred that it was obligated to do so within a reasonable time of receipt of the results
from the third party due diligence firm. However, instead of forwarding those results
when they first came in from MDMC some 9 days before the closing, Bear Stearns
withheld them from MBIA, delayed providing them despite requests for them from
MBIA, used the time to make alterations to the results, and then sent the altered results to
MBIA at the last minute. While Bear Stearns may not have known that Desharnais was
traveling, it may be that the last minute nature of the transmission was intended to
prevent MBIA from having a meaningful opportunity to review the results (May 2014
Decision at 36-38).

As noted in footnote 24 of the May 2014 Decision, these facts may support a finding
that Bear Stearns engaged in acts of active concealment, as what is involved here is more
than mere silence and inaction. Active fraudulent concealment may be found to give rise
to a duty to speak (Clement v
Delaney Realty Corp., 83 AD3d 881 [2d Dept 2011]; Haberman v
Greenspan, 82 Misc 2d 263 [Sup Ct, Richmond County 1975]). Of course, to support
a claim based on active concealment, MBIA will have to show that Bear Stearns' actions
thwarted MBIA's own efforts to fulfill its own responsibilities to protect itself (see Jablonski v Rapalje, 14
AD3d 484 [2d Dept 2005]).
In sum, there is no basis for concluding that Bear Stearns has shown that, as a matter
of law, it was not subject to a duty to disclose the MDMC reports to MBIA.
THE ISSUE OF RELIANCE
The parties do not
dispute that, to maintain its cause of action, MBIA must show that it reasonably or
justifiably relied on the failure of Bear Stearns to disclose material information. Bear
Stearns argues both facets of the requirement, i.e., (1) that there is no evidence
from which it can be concluded that MBIA relied upon its silence; and (2) there is no
evidence from which it can be concluded that any such reliance by MBIA was reasonable
or justified.
THERE ARE TRIABLE ISSUES OF FACT
AS TO WHETHER MBIA ACTUALLY RELIED ON BEAR STEARNS' FAILURE
TO DISCLOSE
In actions founded on fraud, the fraud and injury must be connected. "The one must
bear to the other the relation of cause and effect; not, perhaps, in so close a sequence as
in action on contract, but nevertheless it must appear in an appreciable sense that the
damage flowed from the fraud as the proximate, and not the remote, cause" (Brackett
v Griswold, 112 NY 454 [1889]). It is not necessary that the fraud have been the
exclusive cause of the plaintiff's action or non-action; it is sufficient if the fraud was a
substantial factor in inducing the plaintiff to act or to refrain from acting (State Street
Trust Co. v Ernst, 278 NY 104, 122 [1938]; Curiale v Peat, Marwick, Mitchell
& Co., 214 AD2d 16, 27 [1st Dept 1995]; 2 PJI3d 3:20). And, as noted above,
to the extent that MBIA's claim sounds in active concealment, MBIA will be required to
show that Bear Stearns' action thwarted MBIA's own efforts to protect itself.
Bear Stearns argues that MBIA's witnesses testified that MBIA would not have
relied on mere silence from the underwriter as an indication that there were no issues
with the collateral. The cited testimony includes testimony to the effect that MBIA would
not shortcut its own due diligence processes and would not rely upon someone else to do
its work for it. Also, argues Bear Stearns, MBIA's witnesses testified that MBIA would
never have provided Bear Stearns with any information about what due diligence results
MBIA would have found acceptable. Hence, it is contended, Bear Stearns had no insight
into what would constitute a serious issue that would have caused MBIA to refuse to
proceed to issue an insurance policy.
Bear Stearns' argument would have relevance if what happened here was that Bear
Stearns simply passed along the final MDMC report in a timely, unedited fashion. But
that is not what the evidence shows happened. The issue here is not whether MBIA relied
on some form of generic "silence", but whether MBIA relied upon, or was thwarted in its
exercise of its own ability to protect itself by, Bear Stearns' failure to provide MBIA with
unedited, but available, MDMC due diligence reports prior to closing and Bear Stearns'
failure to explain the reasons for the delayed transmission, i.e., that Bear Stearns
was taking up to the last minute so that the results could be unilaterally doctored. Since
Bear Stearns has not provided any evidence that Bear Stearns did not so rely on the
failure to produce the MDMC reports prior to closing, it cannot be said that Bear Stearns
has made out a prima facie case for summary judgment on the issue of
reliance.
Even if it is assumed that a prima facie case has been made out, there is
ample other evidence presented by MBIA that shows the existence of genuine, triable
issues of fact. Indeed, Bear Stearns cites deposition testimony from Desharnais that
MBIA would not have allowed a deal to close unless the due diligence results had been
received and evaluated. While there is no dispute that MBIA did not evaluate the
purported due diligence results provided by Bear Stearns, there is also no dispute that the
MDMC reports (which could be found to be the due diligence results that were supposed
to be provided) were never provided to MBIA, though it was asking for them. 
Withholding the due diligence results so as to take the time to disguise their true
import and delivering them only at the last-minute without disclosure of the underlying
problems known to the underwriter may be found to have thwarted the insurer's ability to
protect itself. MBIA's failure to disclose the MDMC reports, particularly the last ones
issued on September 25, 2006, and failure to disclose the problems therewith may be
found to have been relied upon by MBIA in its election to proceed with the transaction,
notwithstanding MBIA's own failure to actually [*10]look at the altered documents.
That there is no evidence that Bear Stearns knew what level of results MBIA would
find acceptable is not determinative. The evidence is undisputed on this record that Bear
Stearns knew, or was concerned, that the reports of MDMC, up to and including the last
ones, would be viewed unfavorably by MBIA. Indeed, both Durden and Mongelluzzo
knew that there were big issues with the due diligence. Bear Stearns' argument is refuted
by the evidence which shows that Bear Stearns was sufficiently concerned with the
results that it worked with MDMC to strip out negative information and, even after
MDMC turned in its final product, Bear Stearns altered the report even more and delayed
sending even this altered product until the last minute. In any event, Desharnais has
testified that the loan file due diligence review was "factual" in nature; MBIA had no
insight to give, rather MBIA expected that the due diligence report would provide
information regarding what was discovered in the loan file review conducted at
GMACM's premises.
For these reasons, the Court concludes that there is evidence from which a
reasonable fact-finder could rationally conclude that MBIA relied upon Bear Stearns'
non-disclosures and concealments. While the evidence could also support a contrary
conclusion, there are triable issues, particularly when it is considered that summary
judgment is a drastic remedy and any doubt should be resolved in favor of affording
MBIA the opportunity to present its evidence at trial.
THERE ARE TRIABLE ISSUES OF FACT AS TO WHETHER MBIA
ACTUALLY RELIED ON BEAR STEARNS' FAILURE TO
DISCLOSE
Bear Stearns contends that any reliance on its failures to disclose by MBIA is not
justifiable, as a matter of law, because MBIA was a sophisticated party, advised by
counsel, and able to conduct whatever due diligence it desired before proceeding with
the transaction. Bear Stearns further points out that MBIA had experience in these sorts
of securitization transactions, had the opportunity to raise questions or ask for
information, would not have relied on a third party's assurances, and failed to actually
look at the report it received. As to the last point, Bear Stearns points out that both
Desharnais and Murray testified that the absence of loan grades from a due diligence
report is something that would have been noticed.
The Court cannot hold that reliance by MBIA on Bear Stearns' failure to timely
provide the MDMC reports and failure to truthfully reveal the reasons for the delay in
their transmittal was unjustified as a matter of law. 
The evidence on this record is that it was standard practice for an underwriter to
arrange for due diligence review of loan files in advance of the selection of an insurer.
This was done because the underwriter knew that the insurer would want to have such
due diligence conducted and starting the due diligence earlier would avoid delays in the
completion of the transaction. Given that GMACM and Bear Stearns promised to share
the loan file due diligence results with MBIA, MBIA cannot be faulted for not
conducting its own loan file due diligence review.
While MBIA did receive the "loan tape" containing information regarding the loans,
and conducted its own review of that information, it is evident that the practice was that a
"loan tape" review was not regarded, in common practice, as sufficient. In addition, a
review of a sample of physical loan files was required. Whether MBIA did realize, or
should have realized, the depth of the problems in this transaction from its "loan tape"
review, thus rendering any reliance on [*11]Bear Stearns'
conduct in relation to the MDMC review unreasonable, is a question of fact. Further, as
noted previously, when Bear Stearns sent a revised "loan tape", it advised MBIA that the
"loan tape" had been revised and provided a brief explanation.
As this Court has previously discussed in the prior Decisions, MBIA cannot claim it
was victimized by Bear Stearns' actual fraud in sending an altered report to MBIA
because MBIA never looked at the September 27, 2006 email and its attachment.
Likewise, as the flip side of the same coin, the fact finder may consider whether any
reliance by MBIA on the acts of fraudulent concealment engaged in by Bear Stearns was
unjustified or unreasonable in light of what MBIA would have learned if it had looked at
the altered due diligence report.
The gist of the fraudulent concealment claim is that Bear Stearns never actually
provided MDMC's reports to MBIA and Bear Stearns failed to disclose: a) that MDMC's
"final" report showed that there were problems with the collateral pool; b) that because
GMACM would not let any loans out of the pool, both MDMC and Bear Stearns
engaged in a process of attempting to sanitize the due diligence results; c) that the
process of attempting to sanitize the results delayed the transmittal of any reports to
MBIA; d) that MDMC's final report was not sent to MBIA; and e) that the report, sent at
the last minute to MBIA by Bear Stearns, was not a report that had been approved, or
even reviewed, by MDMC. There are clear questions of fact as to whether Bear Stearns'
conduct included acts of active concealment and whether Bear Stearns' actions thwarted
MBIA's own efforts, if any, to fulfill its own responsibilities to protect itself.
It is for this reason that Bear Stearns' reliance on the principle set forth in cases such
as Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de
C.V., 17 NY3d 269, 278-279 (2011) and HSH Nordbank AG v UBS AG, 95 AD3d 185, 194 (1st
Dept 2012) is unavailing. Those cases state that if the facts represented are not matters
peculiarly within the party's knowledge, and the other party has the means available to
him of knowing, by the exercise of ordinary intelligence, the truth or real quality of the
subject of the representation, he must make use of those means, or he will not be heard to
complain that he was induced to enter into the transactions by misrepresentations. Here,
there is evidence that material facts not disclosed were exclusively within Bear Stearns'
knowledge [FN3]
; there is evidence that would support a finding that MBIA, despite the use of ordinary
intelligence and reasonable efforts, could not have ascertained knowledge of the
concealed facts [FN4]
; and there is evidence which would support a finding that Bear Stearns' actions hindered
MBIA's efforts to protect itself. In the latter regard, such evidence includes evidence that
Bear Stearns' employees were asking for the due diligence report and required the due
diligence report but Bear Stearns was declining to provide it and was not disclosing the
reasons for its refusal to release the report. Further, the last-minute release of the [*12]altered report may have hindered MBIA's efforts to
protect itself, though, of course, the fact finder could conclude that MBIA could have
readily protected itself by asking to adjourn the closing. But Bear Stearns knew
something that MBIA did not — the loan file due diligence review had shown the
presence of considerable issues.
In KNK Enters. v Harriman
Enters., Inc., 33 AD3d 872 (2d Dept 2006), the Appellate Division held, as Bear
Stearns points out, that the plaintiff there could not show reasonable or justifiable
reliance because it, represented by counsel, had decided to proceed with the transaction
despite knowledge that it had not received full information concerning the transaction.
That determination was made after a non-jury trial, not upon summary judgment. Here,
there are clear issues of fact as to whether MBIA had full information concerning the
transaction. 
There are certainly facts present that could support a finding that reliance by MBIA
was not reasonable or justifiable, such as its own "loan tape" review, its own ability to
demand production of the MDMC report rather than abide delays, its own ability to seek
advice of counsel or to adjourn the closing, and its own failure to review the altered
report. But these are not the only facts and, thus, this case is not, in the view of this
Court, one of those rare cases in which the issue of justifiable reliance may be summarily
resolved as a matter of law (see
KSW Mech. Servs., Inc. v Willis of New York, Inc., 63 AD3d 411 [1st Dept
2009]; Brunetti v Musallam,
11 AD3d 280 [1st Dept 2004]).
Accordingly, the Court shall not grant summary judgment to Bear Stearns on the
ground that justifiable reliance cannot be proven.
CONCLUSION
The Court has considered the following papers:
(1) Notice of Motion dated August 31, 2015;
(2) Defendant's Statement of Undisputed Facts, dated August 31, 2015;
(3) Affirmation of Anastasia A. Angelova, Esq.,dated August 31, 2015, together
with the exhibits annexed thereto;
(4) Defendant's Memorandum of Law in Support of Motion, dated August 31,
2015;
(5) Affirmation of Marc L. Greenwald, Esq., dated September 30, 2015, together
with the exhibits annexed thereto;
(6) Plaintiff's Memorandum of Law In Opposition to Motion, dated September 30,
2015; 
(7) Plaintiff's Responses to Defendant's Statement of Undisputed Facts, dated
September 30, 2015;
(8) Reply Affirmation of Anastasia A. Angelova, dated October 15, 2015, together
with the exhibit annexed thereto;
(9) Defendant's Reply to Plaintiff's Responses to Defendant's Statement of
Undisputed Facts, dated October 15, 2015;
(10) Defendant's Reply Memorandum of Law, dated October 15, 2015.
Based on the foregoing papers and for the reasons stated, it is hereby
ORDERED that the motion of Defendant J.P. Morgan Securities LLC, f/k/a Bear,
Stearns & Co., Inc., pursuant to CPLR 3212, for summary judgment against
Plaintiff MBIA Insurance Corporation shall be, and is hereby denied, and it is
further
ORDERED that counsel for the parties shall appear before this Court on June 16,
2016 at 9:30 a.m. for the purpose of scheduling a date for trial and for such other
purposes as may be appropriate; and it is further
ORDERED that the conference hereinabove ordered shall not be adjourned without
the prior written consent of the Court.
The foregoing constitutes the Decision and Order of this Court.
Dated: White Plains, New York
June 6, 2016
E N T E R :
ALAN D. SCHEINKMAN
Justice of the Supreme Court



Footnotes

Footnote 1:There is no requirement
that proof be submitted in the form of an affidavit, as opposed to other acceptable forms,
such as deposition testimony (Muniz v Bacchus, 282 AD2d 387 [1st Dept 2001]).

Footnote 2:Essentially the same
analysis applies to the other documents referenced by Bear Stearns, e.g., the
Mortgage Loan Purchase Agreement, the Underwriting Agreement, the Prospectus
Supplement, and the Indemnification Agreement.

Footnote 3:MDMC had knowledge
of the facts, up to the point that it delivered its truly final report on September 25, 2006.
Bear Stearns, the evidence indicates, had exclusive knowledge of what transpired
thereafter.

Footnote 4:As has been previously
noted, it appears that MBIA did not learn about Bear Stearns' due diligence conduct until
it conducted discovery in an action it brought against GMACM in 2010 (MBIA Ins. Co. v GMAC Mortgage
LLC, 30 Misc 3d 856, 856 [Sup Ct NY County 2010]) (see May 2014
Decision at 4)).